Filed 8/6/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S218993 |
| v. | ) | |
| | ) | Ct.App. 4/1 D064641 |
| SHAUNTREL RAY BROWN, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. SCS264898 |
| _____ | ) | |

A deputy sheriff investigating an emergency call of a fight in progress pulled his patrol car behind defendant Brown's parked vehicle and activated the emergency lights. Approaching the car, he saw Brown sitting behind the wheel, apparently intoxicated. We conclude Brown was detained when the emergency lights were activated. A reasonable person under the circumstances would not have felt free to leave and Brown submitted to the show of authority by remaining in his parked car. We further conclude that Brown's brief detention was supported by reasonable suspicion. Accordingly, we affirm the Court of Appeal's judgment.

## I. BACKGROUND

About 10:37 p.m. on a Sunday night, the San Diego County Sheriff's Department received an emergency call on its 911 line. The caller confirmed his address with the dispatcher and reported some people were fighting in an alley behind his home on Georgia Street in Imperial Beach. He could hear screaming and one person said, "the gun was loaded." The following colloquy ensued:

"911: And it sounds physical?

1

"[Caller]: Yeah, they are fighting right now. You hear the screams?

"911: I hear it. So, you heard one person say they have a gun and it's loaded?

"[Caller]: Yes."

The caller estimated that more than four people were involved, and said the participants lived two houses down from him on the same block. The dispatcher sent an officer to the scene and stayed on the line with the caller. The dispatcher asked the caller to report any other mention of a weapon and asked if anyone had gotten into a car. The caller said there was a car in the alley, facing south toward Fern Avenue. He then relayed that he knew a squad car had arrived because he heard the siren and saw the lights. When the caller confirmed the officer was on the scene, the call ended. It had lasted approximately four minutes.

A dispatcher told Deputy Sheriff Geasland that four suspects were fighting in the alley behind the caller's residence on Georgia Street between Coronado and Fern Avenues, and that "somebody may have said 'something about a loaded gun.'" Geasland was on the scene within three minutes. As he drove north in the alley from Fern towards Coronado, he saw a car coming towards him and away from the fight location. Geasland yelled to the driver, Brown, "Hey. Did you see a fight?" Brown did not respond and kept driving. Geasland continued down the alley but saw no one.

Geasland suspected Brown might have been involved in the fight because he had come from that location and had failed to acknowledge the deputy's question. He was also concerned about the report of a weapon and the possibility that Brown may have been injured. He turned around and drove in the direction Brown had taken.

Geasland found Brown's car parked on Georgia Street, a few houses down from the house behind which the fight had occurred. He pulled behind Brown's

2

car and activated the overhead emergency lights on his patrol car. (See discussion, *post*, at pp. 9-10.) He approached and spoke with Brown, who was in the driver's seat. Brown identified himself and produced his driver's license. He appeared upset and flustered. He was mumbling and had watery, bloodshot eyes. Geasland could smell alcohol coming from the car. He asked if Brown had been drinking and whether he had been involved in the fight. Brown admitted both. A traffic deputy arrived and conducted further investigation for driving under the influence (DUI).

Charged with felony DUI, Brown moved to suppress evidence of his physical condition, statements, and breath test results as the fruits of an unlawful detention. (Pen. Code, § 1538.5.) The trial court denied the motion, concluding Brown had not been detained until the deputy saw signs of intoxication. At that point, the deputy had a reasonable suspicion that Brown had been driving under the influence.

Brown pleaded guilty to driving with a blood-alcohol concentration (BAC) over .08 percent (Veh. Code, § 23152, subd. (b)) and admitted a BAC exceeding .15 percent (*id*. § 23578). He also admitted suffering three prior DUI convictions (*id*. §§ 23550, subd. (a), 23626), and was sentenced to two years in county jail (Pen. Code, § 1170, subd. (h)).

The Court of Appeal affirmed the conviction, holding that "when a vehicle is already stopped, without police action, merely activating emergency lights on a police vehicle, without more, does not constitute a seizure within the Fourth Amendment." Alternatively, the court held that, if a detention did occur, it was supported by reasonable suspicion.

3

## II.  DISCUSSION

An officer may approach a person in a public place and ask if the person is willing to answer questions.  If the person voluntarily answers, those responses, and the officer's observations, are admissible in a criminal prosecution.  (*Florida v. Bostick* (1991) 501 U.S. 429, 434 (*Bostick*); *Florida v. Royer* (1983) 460 U.S. 491, 497 (*Royer*) (plur. opn. of White, J.).)  Such consensual encounters present no constitutional concerns and do not require justification.  (*Bostick*, at p. 434.)  However, "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen," the officer effects a seizure of that person, which must be justified under the Fourth Amendment to the United States Constitution.  (*Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16 (*Terry*); accord, *Bostick,* at p. 434.)  In situations involving a show of authority, a person is seized "if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' " or " 'otherwise terminate the encounter,' " (*Brendlin v. California* (2007) 551 U.S. 249, 254-255 (*Brendlin*)), and if the person actually submits to the show of authority (*id*. at p. 254).

The critical question here is when Brown's detention occurred.  If the encounter with Geasland was consensual, it required no justification.  When Geasland then saw obvious signs of intoxication, a detention to investigate drunk driving was warranted.  But if Geasland effected a detention when he turned on the emergency lights, he was required to "point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that [Brown] may be involved in criminal activity."  (*People v. Souza* (1994) 9 Cal.4th 224, 231 (*Souza*); accord, *United States v. Cortez* (1981) 449 U.S. 411, 417-418 (*Cortez*); *Terry*, *supra*, 392 U.S. at pp. 17, 20-21.)

In reviewing the trial court's suppression ruling, we defer to its factual findings if supported by substantial evidence. We independently assess the legal question of whether the challenged search or seizure satisfies the Fourth Amendment. (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597.)

A. *Detention of a Driver in a Stopped Vehicle*

Here we consider two questions. One, when an officer approaches a motorist in a parked car, what differentiates between a consensual encounter and a detention? Two, what is required to demonstrate submission to a show of authority?

In *People v. Bailey* (1985) 176 Cal.App.3d 402 (*Bailey*) an officer stopped behind the defendant's parked car and activated his emergency lights. (*Id.* at p. 404.) Applying the test from *United States v. Mendenhall* (1980) 446 U.S. 544, 554 (*Mendenhall*), the court concluded a detention had occurred because "[a] reasonable person to whom the red light from a vehicle is directed would be expected to recognize the signal to stop or otherwise be available to the officer. Any reasonable person in a similar situation would expect that if he drove off, the officer would respond by following with red light on and siren sounding in order to accomplish control of the individual." (*Bailey*, at pp. 405-406.)[1]

The Court of Appeal here faulted *Bailey* for overlooking a critical point. Relying on *California v. Hodari D.* (1991) 499 U.S. 621 (*Hodari D.*), it held that "there needs to be some evidence that the person yielded to that show of authority. In the case of a stopped vehicle approached by police, we believe there must be something more than merely activating the red lights to accomplish a detention,

---

[1]     Justice Agliano dissented on the ground the officer's observations were unrelated to and independent of his use of emergency lights. (*Bailey, supra*, 176 Cal.App.3d at pp. 407-408.)

because, as the majority in *Bailey*, *supra*, 176 Cal.App.3d 402 acknowledged, if you do not yield, *police may chase you*." The court reasoned: "[P]olice will give chase, but mere demands, or even pursuit, are not seizures until the citizen accepts the command, either direct or implied, or when the police succeed in restraining that person." Applying *Hodari D*., the appellate court upheld the trial court's finding "that Brown was not stopped by police nor was he detained by the deputy until after the deputy approached the car and immediately observed clear indications of intoxication."

*Bailey* provides the more persuasive authority. *Hodari D*. is distinguishable and inaptly applied here. In *Hodari D*., a group of youths ran away when they saw two officers driving in an unmarked police car. The officers gave chase. As he ran, Hodari tossed away a small rock of crack cocaine. He was subsequently tackled by an officer. (*Hodari D., supra*, 499 U.S. at pp. 622-623.) The question before the Supreme Court was "whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs *even though the subject does not yield*. We hold that it does not." (*Id*. at p. 626, italics added.) The court emphasized that a seizure requires either the use of force or submission to an assertion of authority. (*Id*. at pp. 626-627.) No state action directed at Hodari caused him to flee. Initially the officers had made no attempt to detain him. They were merely driving down the street when the minor chose to run away. Nonetheless, the court concluded: "assuming that [the officer's] *pursuit* in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari *did not comply* with that injunction he was not seized until he was tackled." (*Id*. at p. 629, italics added.) Thus, the cocaine, discarded before that seizure, was not illegally obtained. (*Ibid*.)

This case is different. Brown did not drive away when Geasland turned on the emergency lights. Rather, he stayed in his parked car as the officer

6

approached.  The United States Supreme Court addressed a similar circumstance in *Brendlin*, *supra*, 551 U.S. 249.  There, an officer stopped a car in which Brendlin was a passenger.  Drugs were found both in the car and on Brendlin's person.  (*Id*. at pp. 252-253 & fn. 2.)  The court held that Brendlin was seized during the traffic stop.  (*Id*. at p. 251.)

The court first addressed the applicable standard:  "when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not.  The test was devised by Justice Stewart in *United States* v. *Mendenhall*, 446 U.S. 544 (1980), who wrote that a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' *id*., at 554 (principal opinion)."  (*Brendlin*, *supra*, 551 U.S. at p. 255.)  The court subsequently adopted Justice Stewart's touchstone.  (*Ibid*., citing *Hodari D., supra*, 499 U.S. at p. 627; *Michigan v. Chesternut* (1988) 486 U.S. 567, 573 (*Chesternut*); *INS v. Delgado* (1984) 466 U.S. 210, 215 (*Delgado*).)  In *Bostick*, *supra*, 501 U.S. 429, the court noted that, in some cases, a person may not wish to leave the location of a police encounter but may also not wish to speak with, or otherwise comply with, an officer's request.  In such a circumstance, the "coercive effect of the encounter" is better measured by asking whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  (*Id*. at p. 436.)

The *Brendlin* court concluded that "any reasonable passenger [in Brendlin's circumstances] would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission."  (*Brendlin*, *supra*, 551 U.S. at p. 257.)  It further held that Brendlin had demonstrated submission to authority notwithstanding the fact that only the driver

7

controlled the moving vehicle. "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man [like Hodari D.] is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away. Here, Brendlin had no effective way to signal submission while the car was still moving on the roadway, but once it came to a stop he could, and apparently did, submit by staying inside." (*Id*. at p. 262.)[2]

Similarly, here, Brown submitted to the deputy's show of authority by staying in his car at the scene. The Court of Appeal effectively expanded *Brendlin*'s objective test by requiring that there "needs to be some evidence that the person yielded." It failed to explain, however, what additional evidence would satisfy this expanded standard. The Court of Appeal's approach is both impractical and unnecessary. "[W]hen an individual's submission to a show of governmental authority takes the form of passive acquiescence," we simply consider whether, objectively, " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' " or " 'otherwise terminate the encounter.' " (*Brendlin*, *supra,* 551 U.S. at p. 255, quoting *Mendenhall*, *supra*, 446 U.S. at p. 554 and *Bostick*, *supra*, 501 U.S. at p. 436.)

---

**2** The People construe this passage as dictum but do not further defend the characterization. On the contrary, the high court specifically identified the issue as one of three premises underlying our state court holding with which it disagreed. (*Brendlin*, *supra*, 551 U.S. at p. 259; see *People v. Brendlin* (2006) 38 Cal.4th 1107, 1118 [holding that "defendant has not shown that he, as the passenger, was the subject of the deputy's show of authority *or that he actually submitted to it*" (italics added)].) Indeed, the high court's conclusion that the stop effected a seizure of Brendlin necessarily depended on a finding that Brendlin submitted to the show of authority.

8

The People take a different approach to justifying Deputy Geasland's conduct. They argue that Geasland's actions did not amount to a detention until after he approached Brown's car on foot and noted symptoms of intoxication. The argument fails.

The Supreme Court has long recognized that activating sirens or flashing lights can amount to a show of authority. (*Chesternut*, *supra*, 486 U.S. at p. 575.) Here, Deputy Geasland arrived at the scene with lights and sirens activated. Brown did not respond to Geasland's initial inquiry in the alley. After checking the scene, Geasland drove after Brown. He stopped behind Brown's legally parked car and turned on his emergency lights. Under these circumstances, a reasonable person in Brown's position would have perceived Geasland's actions as a show of authority, directed at him and requiring that he submit by remaining where he was. As a sister-state court has observed: "We see little difference, from the perspective of the occupants in the vehicle, [between] turning on the blue lights behind a moving vehicle and turning on the blue lights behind a parked vehicle. The lights still convey the message that the occupants are not free to leave." (*State v. Gonzalez* (Tenn.Ct.App. 2000) 52 S.W.3d 90, 97; accord, *Smith v. State* (Fla.Ct.App. 2012) 87 So.3d 84, 87-88 [officer detained defendant by parking adjacent to defendant's lawfully parked vehicle and activating his emergency lights and spotlight]; *State v. Morris* (Kan. 2003) 72 P.3d 570, 573-574, 577-579 [officer detained defendant by activating emergency lights and spotlights behind defendant's truck parked off the freeway].)

The People counter that the record fails to establish whether Deputy Geasland activated " 'emergency lights,' 'overhead lights,' red and blue flashing lights, solid lights, amber lights, white lights, or spotlights." Urging that this is an important, if not dispositive, factor, they claim that the ambiguity in the record must be construed in favor of the trial court's order denying the suppression

9

motion. (*People v. Glaser* (1995) 11 Cal.4th 354, 362 (*Glaser*).) They fail to persuade.

Geasland testified that he "activated [his] lights." When the trial court sought clarification on that point, the deputy confirmed that his actions were consistent with having made a traffic stop. The most logical inference to be drawn from this testimony is that Geasland turned on his overhead emergency lights, which included a combination of red and blue lights.[3] The district attorney offered no dispute and the trial court made no findings to the contrary. In their briefing before the Court of Appeal, the People again failed to challenge the point, and the Court of Appeal wrote that the deputy had activated "the patrol car's overhead emergency lights." The People did not petition for rehearing. (See Cal. Rules of Court, rule 8.500(c).) On the contrary, they sought publication of the originally unpublished opinion because it expressly disagreed with the holding in *Bailey*, *supra*, 176 Cal.App.3d at pages 405-406, that a detention occurs when an officer activates his emergency lights. When Brown petitioned for review, the People did not file an answer challenging the factual record. Accordingly, we accept the Court of Appeal's statement that the deputy activated his overhead emergency lights. (See *People v. Nelson* (2008) 43 Cal.4th 1242, 1247.)

The People argue that, because Brown had voluntarily stopped his car before the deputy's display of authority, the appropriate inquiry is whether " 'a reasonable person would feel free to decline the officers' requests or *otherwise terminate the encounter*.' " (*Brendlin*, *supra*, 551 U.S. at p. 255, quoting *Bostick*,

---

[3]     See Vehicle Code, sections 25252 ("Every authorized emergency vehicle shall be equipped with at least one steady burning red warning lamp . . . ."), 25258, subdivision (b) ("An authorized emergency vehicle used by a peace officer . . . may, in addition, display a steady or flashing blue warning light . . . .").

*supra*, 501 U.S. at pp. 435-436, italics added.)  According to the People, the encounter did not begin until the deputy walked up to Brown's car.  Not so.

The People's argument does not acknowledge the evolution of the high court's test.  The simple "not free to leave" test was first articulated in *Mendenhall*, *supra*, 446 U.S. at page 554.  The test was augmented in *Bostick* to encompass a situation in which a person might not want or be able to leave his location because of circumstances "independent of police conduct," but had no desire to interact with officers.  (*Bostick*, *supra*, 501 U.S. at p. 436.)  In *Bostick*, police officers boarded a bus and asked to see the defendant's identification and ticket, then asked to search his luggage.  (*Id*. at pp. 431-432.)  Bostick argued that a reasonable person in his position would not have felt "free to leave" the bus because, if it left, he would have been stranded without his bag.  (*Id*. at p. 435.)  The Supreme Court rejected this argument:  "Bostick's freedom of movement was restricted by a factor independent of police conduct—*i. e.*, by his being a passenger on a bus.  Accordingly, the 'free to leave' analysis on which Bostick relies is inapplicable.  In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  (*Id*. at p. 436.)

The circumstances here are more similar to *Brendlin* and *Mendenhall* than to *Bostick*.  Acting on his own, Brown had stopped his car temporarily on the side of the road.  Nothing, other than the officer's show of authority, prevented his willful departure.  He remained in the driver's seat with his foot on the brake.  There was no evidence that Brown's car was disabled.  He had been driving it minutes before, despite his intoxication.  Brown could also have left on foot, leaving his car legally parked.  The high court in *Brendlin* found it appropriate to consider whether a reasonable passenger in a stopped car would have felt free to "*depart* without police permission."  (*Brendlin*, *supra*, 551 U.S. at p. 257, italics

11

added; see also *ibid.* [a passenger's "attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place"].) As a result, our analysis here focuses on whether a reasonable person in Brown's position would have felt free to leave.

Finally, the People argue that "[t]here is no indication that [Brown] was even aware of the officer's presence until after the officer approached [Brown]'s car on foot." They maintain that "[t]here must be some additional law enforcement action that directs the officer's actions toward that individual—such as issuing oral commands or questions toward that person or, as here, approaching the car on foot and making contact with the person—before a reasonable person would become aware he or she was engaged in an encounter with the police." The argument is not supported by substantial evidence. Geasland did not testify that Brown was unconscious, probing under the seat, or otherwise distracted. The reasonable inference to be drawn from the record was that Brown was aware of the deputy's overhead emergency lights flashing in the dark immediately behind his car.

To be clear, we do not adopt a bright-line rule that an officer's use of emergency lights in close proximity to a parked car will always constitute a detention of the occupants. "[A]ny assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account ' "all of the circumstances surrounding the incident" ' in each individual case." (*Chesternut*, *supra*, 486 U.S. at p. 572, quoting *Delgado*, *supra*, 466 U.S. at p. 215.) As an example, a motorist whose car had broken down on the highway might reasonably perceive an officer's use of emergency lights as signaling that the officer has stopped to render aid or to warn oncoming traffic of a hazard, rather than to investigate crime. Ambiguous circumstances may be clarified by whether other cars are nearby or by the officer's conduct when approaching. (See *Wilson*

12

*v. Superior Court* (1983) 34 Cal.3d 777, 791 & fn. 11; *People v. Garry* (2007) 156 Cal.App.4th 1100, 1110-1112.)  Here, no circumstances would have conveyed to a reasonable person that Deputy Geasland was doing anything other than effecting a detention.  Under the totality of these circumstances, Brown was detained when Geasland stopped behind the parked car and turned on his emergency lights.

B.  *Reasonable Suspicion to Detain*

The next question is whether the detention was supported by reasonable suspicion.  The circumstances here include a reliable citizen's report of a violent fight potentially involving a firearm, the deputy's very quick response time, and Brown's presence near the scene of the fight in the otherwise vacant alley.  These facts justified this brief detention.

The Supreme Court recently summarized the governing principles:  "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'  *United States v. Cortez*, 449 U.S. 411, 417-418 (1981); see also *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).  The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability[,]' *Alabama v. White*, 496 U.S. 325, 330 (1990) . . . . tak[ing] into account 'the totality of the circumstances . . . .'  *Cortez, supra,* at 417.  Although a mere ' "hunch" ' does not create reasonable suspicion, *Terry, supra,* at 27, the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause, *United States v. Sokolow*, 490 U.S. 1, 7 (1989)."  (*Navarette v. California* (2014) __ U.S. __ [134 S.Ct. 1683, 1687] (*Navarette*); accord, *Souza, supra,* 9 Cal.4th at pp. 229-231.)  "[W]here a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper

exercise of the officer's duties." ' " (*People v. Wells* (2006) 38 Cal.4th 1078, 1083 (*Wells*), quoting *In re Tony C.* (1978) 21 Cal.3d 888, 894.)

*Navarette* found an anonymous motorist's 911 call sufficiently reliable to support the traffic stop of a pickup truck on suspicion of drunk driving. (*Navarette, supra,* __ U.S. at p. __ [134 S.Ct. at pp. 1688-1690].) Considering the factors outlined in that case, we reach a similar conclusion here.

First, a caller's personal knowledge "lends significant support to the tip's reliability." (*Navarette, supra,* __ U.S. at p. __ [134 S.Ct. at p. 1689]; accord, *People v. Dolly* (2007) 40 Cal.4th 458, 467 (*Dolly*); *Wells, supra,* 38 Cal.4th at p. 1087.) The caller here reported he was witnessing a fight in the alley outside of his home. He said at least four people, who lived two doors away from him, were involved. He heard one person claim to have a loaded gun.

Second, the caller's report was contemporaneous, a factor that "has long been treated as especially reliable." (*Navarette, supra,* __ U.S. at p. __ [134 S.Ct. at p. 1689]; accord, *Dolly, supra,* 40 Cal.4th at p. 467; *Wells, supra,* 38 Cal.4th at p. 1087.) Indeed, the dispatcher confirmed she could hear people screaming in the background of the call, further corroborating the caller's account. The caller also told the dispatcher that he could hear the siren and see the lights of the responding patrol car.

"Another indicator of veracity is the caller's use of the 911 emergency system," which "has some features that allow for identifying and tracing callers, and thus provide[s] some safeguards against making false reports with immunity." (*Navarette, supra,* __ U.S. at p. __ [134 S.Ct. at p. 1689]; accord, *Dolly, supra,* 40 Cal.4th at p. 467.) This 911 call was recorded, and the caller confirmed his address with the dispatcher. (*Navarette,* at p. __ [134 S.Ct. at p. 1690]; *Dolly,* at p. 467 & fn. 2.)

Finally, as this court has observed, private citizens who report criminal activity generally have no bias or motive other than good citizenship, and therefore tend to be reliable. (*People v. Ramey* (1976) 16 Cal.3d 263, 268-269; *People v. Brueckner* (1990) 223 Cal.App.3d 1500, 1504; see *Illinois v. Gates* (1983) 462 U.S. 213, 233-234.)

Brown relies on *Florida v. J. L.* (2000) 529 U.S. 266, but that case is distinguishable. The high court in *J. L.* held that police lacked reasonable suspicion to detain and frisk the defendant based on an anonymous telephone tip claiming a young Black man in a plaid shirt standing at a particular bus stop was carrying a gun. (*Id*. at pp. 272-274.) The court stated that "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J. L." (*Id*. at p. 271.) *Navarette* recently distinguished *J. L.* on the ground that the caller in *Navarette* provided more than a "bare-bones tip." (*Navarette*, *supra*, __ U.S. at p. __ [134 S.Ct. at p. 1692].) *J. L.* is likewise distinguishable here. This caller's eyewitness knowledge, contemporaneous reporting, use of the 911 system, and confirmation of his address provided additional indicia of reliability. Further, although the caller did not personally observe an assault with a firearm (cf. *Dolly*, *supra*, 40 Cal.4th at p. 465), he did hear one of the people involved claim to have a loaded gun. In the context of a fight in progress, such a claim suggests a credible threat. The caller's contemporaneous report of this declaration was more reliable than the amorphous circumstances in *J. L.*

Brown further argues that the caller's reliability must be assessed based on the facts known to Deputy Geasland, not the 911 dispatcher, and that Geasland was unaware of the circumstances under which the call was placed. The argument is unpersuasive. An officer may arrest or detain a suspect "based on information

15

received through 'official channels.' " (*People v. Madden* (1970) 2 Cal.3d 1017, 1021; see *United States v. Hensley* (1985) 469 U.S. 221, 230-233 (*Hensley*).) If a 911 call "has sufficient indicia of reliability . . . a dispatcher may alert other officers by radio, who may then rely on the report, [citation], even though they cannot vouch for it." (*U.S. v. Cutchin* (D.C. Cir. 1992) 956 F.2d 1216, 1217-1218; accord, *U.S. v. Torres* (3d Cir. 2008) 534 F.3d 207, 210.) However, upon proper objection (*People v. Rogers* (1978) 21 Cal.3d 542, 547-548), " ' "the People must prove that the source of the information is something other than the imagination of the officer who does not become a witness." ' " (*Madden*, at p. 1021, quoting *Remers v. Superior Court* (1970) 2 Cal.3d 659, 666; accord, *People v. Harvey* (1958) 156 Cal.App.2d 516, 523-524 (conc. opn. of Dooling & Draper, JJ.).) This requirement can be met by calling the police dispatcher as a witness at the suppression hearing or by introducing a recording of the 911 call. (*In re Richard G.* (2009) 173 Cal.App.4th 1252, 1260; *People v. Orozco* (1981) 114 Cal.App.3d 435, 444.) Here, the dispatcher was present at the hearing but was not called because Brown stipulated to admission of the 911 recording into evidence. That recording provided ample basis to review the caller's reliability. (*Dolly*, *supra*, 40 Cal.4th at p. 467, fn. 2; *People v. Lazanis* (1989) 209 Cal.App.3d 49, 57.)[4]

---

[4] Brown further argues that it is improper to impute the 911 dispatcher's knowledge of the circumstances of the call to Deputy Geasland because the imputed knowledge doctrine applies only to other law enforcement officials, and "[a] civilian 911 operator" does not meet that criteria. He relies on *U.S. v. Colon* (2d Cir. 2001) 250 F.3d 130, 136-137. We need not decide if *Colon* is persuasive authority because Brown forfeited this argument by failing to object on that basis in the trial court. His lack of objection and stipulation to admission of the recording gave the People no reason to address such an argument or present additional evidence below. (*Dolly*, *supra*, 40 Cal.4th at p. 466, fn. 1.)

As in *Navarette*, *supra*, __ U.S. at page __ [134 S.Ct. at pp. 1688-1690], this 911 caller demonstrated adequate indicia of reliability to credit his account of a violent fight in progress involving several people and possibly a loaded gun in the alley behind the caller's residence.

The next question is whether the deputy could reasonably suspect Brown had been involved in the fight. (*Michigan v. Summers* (1981) 452 U.S. 692, 699-700; *Cortez*, *supra*, 449 U.S. at pp. 417-418; *Terry*, *supra*, 392 U.S. at pp. 16-19.) The absence of any suspect descriptions makes this a close question. Nonetheless, we conclude that the totality of the circumstances justified Brown's very brief detention.

The reasonableness of a detention involves both questions of fact and policy. Under *Terry*, we must balance " 'the need to search [or seize] against the invasion which the search [or seizure] entails.' " (*Terry*, *supra*, 392 U.S. at p. 21; accord, *Glaser*, *supra*, 11 Cal.4th at p. 363.) Police officers are required to make "swift, on-the-spot decisions" and the Fourth Amendment does not require us to " 'indulge in "unrealistic second-guessing" ' " of the officer's conduct. (*United States v. Sokolow* (1989) 490 U.S. 1, 11 (*Sokolow*).)

The reported crime was serious. It involved a violent fight between at least four people, one of whom claimed to have a loaded gun. Geasland arrived at the scene within three minutes of being dispatched and while the caller remained on the line. (See *Dolly*, *supra*, 40 Cal.4th at p. 468.) Brown was driving away from the location of the fight and was the only person in sight in the residential alley just after 10:30 p.m. The very recent report of a crime in progress, Brown's close proximity to the crime scene, and the lack of other vehicle or pedestrian traffic in the residential alley are all significant factors. (See, e.g., *People v. Conway* (1994)

17

25 Cal.App.4th 385, 387-388, 390; *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733-734.)[5]

Deputy Geasland also attributed significance to the fact that Brown ignored the deputy's attempt to question him about the fight and continued driving away from the scene. The deputy recounted that Brown drove directly past his marked patrol car in the "kind of tight" alley. Geasland rolled down his window and "yelled out" to defendant, "Hey. Did you see a fight?" Brown neither responded

---

[5]     That the fight had ended does not affect the analysis in this case. In *Hensley*, *supra*, 469 U.S. 221, the court upheld a defendant's detention 12 days after an armed robbery on the basis of a " 'wanted flyer.' " (*Id*. at p. 223.) In deciding whether reasonable suspicion could justify a detention for a "completed crime" (*id*. at p. 227), the court acknowledged that "[a] stop to investigate an already completed crime does not necessarily promote the interest of crime prevention" and that "the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law." (*Id*. at p. 228.) The court also observed that "officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop." (*Id*. at pp. 228-229.) Nonetheless, the court concluded that "[i]t is enough . . . if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a *completed felony* . . . ." (*Id*. at p. 229, italics added.) This crime was not "completed" in the sense that *Hensley* contemplated. The fight had ended only a minute or two before Geasland's arrival, Brown was very near the scene, he was possibly armed, and there was not a "wide[] range of opportunity to choose the time and circumstances of the stop." (*Id*. at pp. 228-229; cf. *Dolly*, *supra*, 40 Cal.4th at p. 466; see also 4 LaFave, Search and Seizure (5th ed. 2012) § 9.2(a), pp. 373-374.)

Brown argues that the crime involved here was a misdemeanor. We need not decide if his characterization is accurate, or under what circumstances, if any, the holding in *Hensley* extends to misdemeanor offenses. (Compare *U.S. v. Grigg* (9th Cir. 2007) 498 F.3d 1070, 1081, and *U.S. v. Moran* (10th Cir. 2007) 503 F.3d 1135, 1141 & fn. 4, with *Gaddis v. Redford Township* (6th Cir. 2004) 364 F.3d 763, 771, fn. 6.)

nor acknowledged the question. Geasland testified: "[w]hen he didn't answer me, acknowledge me, or anything like that, I had a feeling he was involved." The trial court did not rely on this circumstance, and neither do we. Geasland acknowledged that Brown may have simply failed to hear him and the trial court ultimately made no factual finding on that issue. Moreover, even if Brown ignored the deputy, a " 'refusal to cooperate [with law enforcement], without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' " (*Illinois v. Wardlow* (2000) 528 U.S. 119, 125 (*Wardlow*); accord *Bostick*, *supra*, 501 U.S. at p. 437; *Royer*, *supra*, 460 U.S. at p. 498.) Notably, Geasland did not describe any behavior by Brown as they passed in the alley that could be construed as nervous or evasive. (Cf. *United States v. Arvizu* (2002) 534 U.S. 266, 270-271, 276-277 (*Arvizu*) [giving some weight to the fact that the defendant's car slowed dramatically as he approached the officer; he stiffened and appeared to pretend the officer was not there, even though most drivers in that area "gave border patrol agents a friendly wave"; shortly thereafter, all of the children in the car put their hands up and began to waive mechanically at the officer "as if instructed to do so"].)

Nonetheless, the fact that Brown drove away without responding left Geasland with no alternative short of a detention to identify him and determine if he had been involved in the fight. Notably, when Geasland turned around to follow Brown's car, he found it parked on Georgia Street only a few houses down from the house behind which the fight had occurred. Brown's decision to drive back towards the residence, along with the report of a possible weapon, provided an objective reason to suspect that he might present an ongoing danger to the

19

occupants of the house and the deputies who had responded to investigate. (*Dolly*, *supra*, 40 Cal.4th at p. 466.)[6]

Brown emphasizes that his conduct was consistent with lawful activity. However, " '[t]he possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct.' " (*Souza*, *supra*, 9 Cal.4th at p. 233, quoting *In re Tony C.*, *supra*, 21 Cal.3d at p. 894; accord *Arvizu*, *supra*, 534 U.S. at p. 274; *Wardlow*, *supra*, 528 U.S. at p. 125; *Sokolow*, *supra*, 490 U.S. at p. 9.) "What is required is not the *absence* of innocent explanation, but the *existence* of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " (*Glaser*, *supra*, 11 Cal.4th at p. 373.) Although each of a series of acts may be " 'perhaps innocent in itself,' " taken together, they may " 'warrant[] further investigation.' " (*Arvizu*, at p. 274, quoting *Terry*, *supra*, 392 U.S. at p. 22.) The purpose of the detention is to resolve the ambiguity by allowing the officer to briefly investigate further. (*Souza*, at p. 233; *Wardlow*, at p. 125.)

Moreover, it is significant that the detention preceding Geasland's observations was exceptionally brief and nonintrusive. (*Hensley*, *supra*, 469 U.S. at p. 235 [examining, under *Terry*, both "the length and intrusiveness of the stop and detention"].) As noted in *Glaser*, *supra*, 11 Cal.4th at page 367, a detention's "brevity weighs heavily in favor of a finding of reasonableness." Geasland merely stopped his cruiser, flashed his emergency lights, and walked toward Brown's car. When he was close enough to speak, he noticed several signs of Brown's

---

[6] Although Geasland did not specifically mention this factor in his testimony, we look to the objective facts known to the deputy to determine whether the stop was reasonable under the circumstances. (*Brigham City v. Stuart* (2006) 547 U.S. 398, 404; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145 (*Letner*).)

20

intoxication.  Routine traffic detentions are considerably less intrusive than a search (*Wells*, *supra*, 38 Cal.4th at p. 1087), and here Brown had already stopped his car on his own.  The deputy did not issue commands over a loudspeaker, draw a weapon, order Brown to step out of the car, or subject him to a pat-down search.  But for the use of the emergency lights, the encounter would have been consensual.

An officer "who lacks the precise level of information necessary for probable cause to arrest" is not constitutionally required to "simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.  [Citation.]  A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (*Adams v. Williams* (1972) 407 U.S. 143, 145-146; accord, *Letner*, *supra*, 50 Cal.4th at p. 149.)

Here, a citizen living in a residential neighborhood made an emergency call seeking police assistance because a fight was happening in an alley behind the citizen's home.  The caller gave a specific address.  The caller heard screaming and a reference to a loaded gun.  The dispatcher heard screaming as well.  The caller confirmed the fight was occurring as they spoke and remained on the line to narrate events.

Within three minutes of dispatch Deputy Geasland arrived with lights and siren activated.  Brown, the only person in the alley, was driving a car away from the reported location of the fight.  It was after 10:30 p.m.  Brown left the alley but drove back toward the scene on the main street.  Under these circumstances, it was reasonable for Geasland to suspect the sole occupant of the alley may have been involved in the fight and to effectuate a brief and minimally intrusive detention,

21

which immediately yielded observations of criminal activity. The citizen who called for his help would surely hope the officer would do more to secure the safety of his neighborhood than shrug and drive away. (*Adams v. Williams*, *supra*, 407 U.S. at pp. 145-146; *Wells*, *supra*, 38 Cal.4th at p. 1083.)

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Brown

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 226 Cal.App.4th 142
**Rehearing Granted**

_____

**Opinion No.** S218993
**Date Filed:** August 6, 2015

_____

**Court:** Superior
**County:** San Diego
**Judge:** Ana L. España and Theodore M. Weathers

_____

**Counsel:**

Henry C. Coker, Public Defender, Randy Mize, Chief Deputy Public Defender, Emily Rose-Weber and Robert L. Ford, Deputy Public Defenders, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Steven T. Oetting, Deputy State Solicitor General, Julie L. Garland, Assistant Attorney General, Doris A. Calandra, Melissa Mandel and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert L. Ford
Deputy Public Defender
450 B Street, Suite 1100
San Diego, CA  92101
(619) 338-4831

Donald W. Ostertag
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-3160