Filed 1/21/26  P. v. Jaramillo CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ADRIAN DANIEL JARAMILLO,<br><br>    Defendant and Appellant. | G063955<br><br>(Super. Ct. No. 23HF0895)<br><br>O P I N I O N |

            Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge. Reversed and remanded with directions.

            Law Office of Lisa A. Kopelman and Lisa A. Kopelman, under appointment by the Court of Appeal, for Defendant and Appellant.

            Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa

Mandel and James Spradley, Deputy Attorneys General, for Plaintiff and Respondent.

*       *       *

Defendant Adrian Daniel Jaramillo appeals from a judgment entered after he pled guilty to various, primarily drug-related charges. He contends the trial court erred in denying his motion to suppress evidence obtained from his person and a vehicle he was driving after he was stopped for an equipment related Vehicle Code violation. From his perspective, the searches resulted from an unjustifiably prolonged traffic stop which violated his constitutional rights. Viewing the totality of the circumstances, we agree the detaining officer prolonged the stop without the reasonable suspicion necessary to justify detouring from the traffic stop's mission. Accordingly, we reverse the judgment, and we remand the matter to allow Jaramillo to withdraw the guilty plea and with directions to the trial court to enter a new order granting his suppression motion.

FACTS

I.

CIRCUMSTANCES OF THE CHARGED OFFENSES

Just after 1:30 a.m. on a Thursday, Newport Beach Police Officer Quinton McKay initiated a traffic stop of a Dodge Durango on Pacific Coast Highway for having a nonfunctioning rear license plate light. The vehicle yielded and stopped "immediately" and the officer did not observe any furtive movements or suspicious behavior from its occupants. Officer McKay approached and asked Jaramillo, who was driving, to roll down the windows. Looking inside, Officer McKay saw a large backpack on the front passenger seat, a male passenger sitting in the rear right seat, and several tools on the

2

left rear seat directly behind Jaramillo. He recognized a couple of the tools to be power tools, including an electric pipe cutter and a Sawzall reciprocating saw, and commented to Jaramillo and the passenger that there were "a lot of tools."

Officer McKay asked whether either occupant was on probation or parole, requested their identification, and asked if the vehicle was Jaramillo's. The passenger said he did not have identification on him. Jaramillo denied being on probation or parole, provided his identification, and said the vehicle belonged to his roommate. After the officer explained he pulled them over because of nonfunctioning license plate lights, referring to it as "nitty gritty, stupid shit," he asked if there were any weapons in the car. Jaramillo stated there were not and confirmed there was nothing in the car the officer should worry about; the passenger did the same. Officer McKay then unsuccessfully tried to obtain Jaramillo's consent to search the vehicle.

In response to a subsequent question, Jaramillo denied having anything illegal in the car, including drugs. When asked why he was not looking at Officer McKay when answering, Jaramillo explained he was looking in the car's mirror at another officer who was approaching. Officer McKay identified the other officer as his partner and turned back to questioning the passenger about his identification. The passenger said he did not have his wallet or any form of identification on him, so Officer McKay asked a variety of questions to get basic information such as name, birthdate, and address. Regarding the latter, the passenger said he did not have an address because he was "couch surfing." He denied anything in the car being his; Jaramillo said the backpack in the front seat was his.

3

Without requesting the vehicle's registration or proof of insurance, Officer McKay asked the two to "[s]it tight" and returned to his patrol vehicle to run a records check based on the information provided to him. The roughly two and a half minute check revealed Jaramillo had a past methamphetamine-related arrest but no active probation, parole, or warrant. The check on the passenger returned no information.

With approximately seven minutes having elapsed since the initiation of the traffic stop, Officer McKay put on latex gloves and reapproached the stopped vehicle. He said to Jaramillo, "Alright, sir, I'm just gonna have you step out and we're gonna talk outside." In response to a question about whether he had any weapons on him, Jaramillo said he had a pocket knife in his back pocket but nothing else.

After Jaramillo was out of the vehicle, Officer McKay instructed him to face the door and link his fingers behind his back. He then escorted Jaramillo to the sidewalk where he asked whether he could check Jaramillo's person for additional weapons. Jaramillo responded, "Uh, yeah," and the officer searched him, reaching the back pocket with the pocket knife last. The search of Jaramillo's various pockets revealed lock picks, shims, a bump key, and a "Flipper Zero" device. When questioned what he used the Flipper Zero for, he said he used it for penetration testing of his home networks because he has a server. Officer McKay inspected and powered on the Flipper Zero before proceeding back to the vehicle to speak with the passenger.

Officer McKay told the passenger to step out of the vehicle, led him to the sidewalk, and inquired if he could search him for weapons. The passenger agreed to be searched and denied having any weapons or anything illegal on him. The search yielded what the officer recognized as a "crumb" of

4

methamphetamine in a jacket pocket. Officer McCay asked some questions about methamphetamine use; the passenger admitted to having "snorted" before and said he normally smokes. He said he "believe[d] [Jaramillo] also inhales." In response to further questioning, the passenger denied knowing what else was in the vehicle and ownership of anything in it, and he said he could not give the officer requested consent to search the vehicle because it was not his.

Returning to Jaramillo, Officer McKay inquired about the vehicle's contents. Jaramillo said the backpack and tools were his, explaining he was using them to fix up his grandma's house because she had recently passed away. He denied knowing what else was in the vehicle because he was just borrowing it. And after confirming there was "nothing in the car that[] [was] going to get [him] in trouble," Jaramillo said, "No", when Officer McKay asked if he could check and make sure. Notwithstanding Jaramillo's response, Officer McKay performed a roughly two-minute search of the vehicle's interior.

After the preliminary search, the other officer on the scene provided Officer McKay with identity information obtained from a conversation with the passenger. He used that information to run another records check. It was later determined the passenger initially gave his middle name as his first name and falsely stated he had no middle name.

At some point after the second passenger records check, Officer McKay performed a full search of the vehicle, including Jaramillo's backpack. The search uncovered alleged illicit drugs and paraphernalia.

Jaramillo was charged with five felony drug related counts and one misdemeanor burglary tool related count: sale or transportation for sale

5

of gamma hydroxybutyrate (GHB) (Health & Saf. Code, § 11352, subd. (a)); possession for sale of methamphetamine (*id.* at § 11378); sale or transportation for sale of methamphetamine (*id.* at § 11379, subd. (a)); possession for sale of Alprazolam (*id.* at § 11375, subd. (b)(1)); possession for sale of GHB (*id.* at § 11351); and possession of burglary tools with felonious intent to burglarize (Pen. Code, § 466).

## II.

### MOTION TO SUPPRESS

Jaramillo moved pursuant to Penal Code Section 1538.5 to suppress the evidence obtained from his person and the vehicle. Among other arguments, he contended the traffic stop was prolonged without justification in violation of his rights under the Fourth Amendment of the United States Constitution (U.S. Const., 4th Amend.; accord, Cal. Const., art. I, § 13). His primary focus was on the officer's actions after the initial records check revealed no probation, parole, or warrants.

The trial court held a hearing on Jaramillo's motion at which it heard testimony from Officer McKay and viewed a video of the traffic stop captured by the officer's body worn camera. In addition to detailing what took place during the traffic stop, Officer McKay provided additional information on the circumstances surrounding it. He relayed the city had been receiving "frequent calls for catalytic converter thefts." Based on his training and experience, he was aware the tools he observed in the vehicle are sometimes used to commit such a crime. At the same time, he acknowledged the tools are not illegal, have noncriminal uses, and may be bought at a store. On cross-examination, he also admitted there had not been any reports of catalytic converter theft on the night of the stop and his

6

suspicion regarding the tools "was just based on the fact in [his] mind [that] theoretically they could be used to commit [that type of theft]."

In explaining his reasons for putting on the gloves and having the vehicle occupants step out after running the initial records check, Officer McKay said he decided to investigate matters beyond the traffic violation that led to the traffic stop. He elaborated: "I wanted to further investigate the potential that those power tools were burglary tools, the potential that a passenger was lying to me, the potential . . . the vehicle that was not registered to him could have been stolen, the potential that he may have been driving under the influence [(DUI)] as it relates to my training and experience[,] as well as the traffic violation which he was initially pulled over for if he needed a citation or he did not based on the fact that he may or may not own the vehicle." Regarding DUI, the officer agreed there was nothing in his police report regarding a suspicion or signs of Jaramillo having been under the influence or impaired by any substance at the time of the traffic stop. When questioned why he would rely on matters not documented in his report to further investigate, Officer McKay responded, "To continue my investigation, I don't need a lawful reason. I have things that I'm investigating[,] and my investigation evolves throughout the course of the traffic stop."

### III.

#### TRIAL COURT'S RULING AND GUILTY PLEA

During the parties' arguments and before ruling on the motion, the trial court made various comments about its perspective of the issues. It found it "a little weird for two males to be in a car at 1:30 or 1:40 [in the morning[,] with one male riding in the back seat [and] a backpack sitting in

7

the front seat." Regarding the presence of tools in the car, the court stated it would not "place much relevance in that by itself": "I'm telling you[,] I don't think the fact that somebody has a Sawzall and a pipe cutter in the back of their car is much." And as for any DUI related matters, it indicated it would not consider "the DUI stuff" because it was not in the police report, Officer McKay "didn't consider it," there was no evidence that anyone was under the influence, and there was "no evidence that [Jaramillo] had a record."

After rewatching the body worn camera videos, reviewing Officer McKay's testimony and case law, and taking a weekend to think about it, the trial court denied Jaramillo's motion. Although the court detailed some facts, it did not explain its rationale.

After pleading guilty to all charges and being sentenced to two years of formal probation, Jaramillo timely appealed.

DISCUSSION

Defendant argues evidence found during the search of his person and vehicle should have been suppressed because Officer McKay violated his Fourth Amendment rights by unjustifiably prolonging his detention beyond what was necessary to complete the mission of the traffic stop. "'"In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment."' [Citation.] In doing so we do not consider each fact in isolation. Instead, 'we must consider "the totality of the circumstances—the whole picture."'" (*People v. Flores* (2024) 15 Cal.5th 1032, 1043 (*Flores*).)

8

Applying this standard, we conclude the trial court erred in denying the suppression motion.[1]

## I.

### APPLICABLE LAW

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . .' [Citations.] A traffic stop 'constitutes a "seizure" of "persons" within the meaning of' the Fourth Amendment, but 'where the police have probable cause to believe that a traffic violation has occurred,' the seizure is constitutionally reasonable. [Citation.] Nevertheless, a traffic stop 'that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.' [Citation.] '[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.' [Citation.]

"'A seizure for a traffic violation justifies' a '"relatively brief encounter"' for police investigation of the traffic violation. [Citation.] '[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop [citation] and attend to related safety concerns [citation]. [Citations.] Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." [Citations]. Authority

---

[1] Our resolution of this issue precludes the need to reach Jaramillo's other arguments, including whether his consent to the search of his person was valid and whether Officer McKay had probable cause to search the vehicle.

for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. [Citation.]' [Citation.]

"The United States Supreme Court has identified tasks that are part of an officer's mission during a stop for a traffic violation: 'Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." [Citation.] Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. [Citations.]' [Citation.] The temporary detention may also include 'a criminal history check [citation], which is done by consulting an in[-]car computer terminal or radioing dispatch. [Citations.]' [Citation.] "'And although not specifically compelled by law, certain other steps customarily taken as matters of good police practice are no less intimately related to the citation process: for example, the officer will usually discuss the violation with the motorist and listen to any explanation the latter may wish to offer.'" [Citation.] These tasks are included within the officer's mission during a traffic stop because they 'serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. [Citations.]' [Citation.] An officer may also require a lawfully stopped driver to exit the vehicle for officer safety to complete his traffic stop mission. [Citation.]

"'On-scene investigation into other crimes, however, detours from [the traffic stop's] mission. So too do safety precautions taken in order to facilitate such detours. [Citation.]' [Citation.] While '[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop,' the officer 'may not do so in a way that prolongs the stop, absent the reasonable

10

suspicion ordinarily demanded to justify detaining an individual. [Citation.]'" (*People v. Gyorgy* (2023) 93 Cal.App.5th 659, 669–670, fn. omitted (*Gyorgy*).)

"'Reasonable suspicion is a lesser standard than probable cause and can arise from less reliable information than that required for probable cause. [Citation.]' [Citation.] But a detaining officer must be able to '"point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." [Citation.]' [Citation.] '"[A]n investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith."'" (*Gyorgy, supra*, 93 Cal.App.5th at p. 675.)

## II.

### ANALYSIS

Both parties concede the inception of the traffic stop was lawful due to an observed equipment violation. (See Veh. Code, § 24601.) The parties also appear to agree it was lawful for Officer McKay to ask for identification, inquire about weapons, and perform a records check—all activities which occurred within roughly the first six and a half minutes of the stop. (See *Rodriguez v. U.S.* (2015) 575 U.S. 348, 355 (*Rodriguez*) [describing such matters as "'ordinary inquiries incident to [the traffic] stop'"].) Where their agreement diverges is whether the detention became unwarrantedly prolonged when Officer McKay put on gloves and ordered Jaramillo out of the vehicle around the seven-minute mark. Jaramillo contends it was a clear unjustified departure from investigating and resolving the equipment violation for which he was stopped. The People argue "reasonable suspicion of catalytic converter theft and drug activity developed [during the first seven

11

minutes of the traffic stop] and supported expanding the scope of the detention to investigate that activity." On the record before us, we find merit in Jaramillo's argument.

Regarding catalytic converter theft, Officer McKay observed tools in the back seat of the vehicle which could be used for that type of theft. But, he confirmed the tools themselves were not illegal and had noncriminal uses, and Officer McKay did not observe any evidence of actual theft (e.g. vehicle parts). Although he testified there had been catalytic converter theft reported in the city in the recent past, he confirmed none had been reported that night. Further, there was no indication the area of the city the vehicle was driving through was one where such thefts had occurred, and there was no evidence Jaramillo had any type of theft related criminal history. Absent something more, and notwithstanding the time of day, the presence of the tools in the vehicle was insufficient to provide reasonable suspicion of catalytic converter theft.

We reach the same conclusion about potential drug activity. Officer McKay did not observe any potential drug related paraphernalia in the vehicle, and both Jaramillo and the passenger denied any drug use. Notably, the trial court declined to consider any DUI related arguments because "there[] [was] no evidence that anybody was under the influence." The only thing potentially linking Jaramillo to drugs was the past methamphetamine related case that Officer McKay said he became aware of during the records check. But, Officer McKay testified he did not know from when that case originated and there was no testimony he knew details of what it involved. The fact of an arrest at an unknown time in the past cannot, without more, create reasonable suspicion of present criminal activity.

12

(*People v. Pantoja* (2022) 77 Cal.App.5th 483, 491 [past criminal arrest or conviction is not sufficient alone for reasonable suspicion to detain or search].) Concluding otherwise would effectively allow a further investigation of anyone with a criminal background who is stopped for a traffic violation.

Without explaining how they factor into the calculus, the People also note the large backpack in the front seat of the vehicle, the passenger's location in the back seat instead of the front, and Officer McKay's inability to verify the passenger's identity based on initial information provided. None of these circumstances, individually or combined, are sufficient to provide reasonable suspicion under the circumstances. We recognize "the possibility of innocent explanations for the factors relied upon by a police officer does not necessarily preclude the possibility of a reasonable suspicion of criminal activity. [Citations.] . . . Indeed, the United States Supreme Court has acknowledged that by allowing the police to act based upon conduct that was 'ambiguous and susceptible of an innocent explanation,' [case law has] 'accept[ed] the risk that officers may stop innocent people.'" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 146–147.) However, there must nevertheless be specific articulable facts providing some objective manifestation that the person detained may be involved in criminal activity. (See *People v. Brown* (2015) 61 Cal.4th 968, 985–986; *Gyorgy, supra*, 93 Cal.App.5th at p. 675.) That standard "is not satisfied simply because a person's behavior is 'odd.'" (*Flores, supra*, 15 Cal.5th at p. 1045.) And, curiosity or hunch, even if pursued in good faith, cannot render a prolonged detention lawful. (*Gyorgy*, at p. 675.)

Understandably, the People do not attempt to justify Officer McKay's action of ordering Jaramillo out of the vehicle by saying it was

13

necessary to ensure officer safety as part of the traffic stop. Although an officer making a traffic stop generally may order the driver and passengers out of the vehicle pending completion of the stop, the underlying justification for allowing such action is officer safety. (*Maryland v. Wilson* (1997) 519 U.S. 408, 411–415.) Here, Officer McKay permitted the vehicle's occupants to remain in the vehicle during the first seven minutes of the stop, including the roughly two minutes it took him to return to his patrol vehicle to run a records check. In addition, after the first two minutes of the stop, a second officer was on site monitoring Jaramillo and the passenger's behavior in the vehicle. Under these circumstances, officer safety would not justify ordering them to exit the vehicle to bring resolution to the equipment violation issue.

Because Officer McKay detoured from the mission of the traffic stop when he ordered Jaramillo out of the vehicle, but the totality of the circumstances did not provide reasonable suspicion for doing so, Jaramillo's motion to suppress should have been granted. (See *Rodriguez, supra*, 575 U.S. at p. 357.) "Because it is impossible to assess the impact of an erroneous denial of a motion to suppress evidence on a defendant's decision to plead guilty, the harmless error rule is inapplicable in appeals taken pursuant to Penal Code section 1538.5, subdivision (m)." (*People v. Suggs* (2023) 93 Cal.App.5th 1360, 1366.)

## DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings to allow Jaramillo to withdraw his guilty plea, after which the trial court shall vacate its order denying Jaramillo's suppression motion and enter a new order granting it.


DELANEY, J.


WE CONCUR:


MOORE, ACTING P. J.


SANCHEZ, J.

15