Filed 12/30/21  P. v. White CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>APONDO LATRAIL WHITE, JR.,<br><br>        Defendant and Appellant. | C089037<br><br>(Super. Ct. No. CRF-16-3387) |

Police stopped a vehicle in which defendant Apondo Latrail White, Jr., was a passenger and discovered heroin, cocaine and a handgun.  A jury convicted defendant of possession of cocaine and heroin while armed with a loaded firearm, transportation of cocaine and heroin, possession of cocaine and heroin for sale, and possession of a firearm by a felon.  The trial court sentenced defendant to 10 years eight months in prison.

1

Defendant now challenges the police stop, the firearm-related charges and enhancements, and the admission of evidence of his prior convictions. We will modify the judgment to stay, under Penal Code section 654,[1] the sentence imposed on defendant for being a felon in possession of a firearm under section 29800, and affirm the judgment as modified.

BACKGROUND

A

A security guard working the graveyard shift at Capitol Yards, an apartment complex in West Sacramento, was approached by a resident who said a Prius had parked in a space reserved for individuals with disabilities and four or five people had gotten out of the car. The guard checked on the car and saw that it did not have a disability placard or resident sticker. Per policy, the guard called to have the car towed away. When the tow truck arrived, the guard noticed some individuals in the courtyard by the swimming pool.

When the tow truck driver had loaded up the vehicle, the guard noticed the individuals were wandering around the complex. He called the police because the individuals were hanging out and did not appear to be residents. The police dispatcher asked for the license plate number of the towed car and the guard gave it to her.

Gregory Lang, a West Sacramento motorcycle officer, received a dispatch that a security guard from the Capitol Yards apartment complex reported that a car parked there was towed and the license plate came back as an armed and dangerous vehicle out of Stockton. When Officer Lang got there, a security guard walking out of the parking lot was pointing at two black males on the sidewalk. Officer Lang took the security guard to be the reporting party. Officer Lang saw a car drive out of a trailer park and stop at the

_____

[1] Undesignated statutory references are to the Penal Code.

2

curb. He watched the two males get into the car. One got in the front passenger seat and the other got in the backseat behind the driver. Officer Lang was radioing his observations to responding units. Another officer in a patrol car arrived with his lights activated. The officers conducted a traffic stop at gunpoint.

Both officers were yelling instructions to the occupants to remain stopped and show their hands, while other officers were arriving. Officer Lang noticed that the passenger in the back seat put his right hand above his head and dropped his left hand behind the driver's seat like he was trying to conceal something. He advised other officers arriving on the scene that the passenger in the back might be concealing something. This passenger -- J.O., a juvenile -- then slowly raised his left hand over his head.

Officers ordered the occupants out of the vehicle. Officer Lang looked to see if anything had been concealed by the passenger in the back and saw a handgun on the floorboard behind the right front passenger seat.

Detective Jerry Watson retrieved a silver/black Colt 1911-style nine-millimeter firearm that had been partially tucked under the front passenger seat. The magazine in the butt of the gun was loaded with seven rounds but the chamber was empty.

In the door well on the front passenger side, Detective Watson found a small bag containing a brown substance. It appeared to be tar heroin. In the glove box, there was a baggie containing a white substance that appeared to be cocaine. Behind that bag were numerous little baggies containing a brown substance that appeared to be tar heroin, as well as a box of sandwich baggies. The parties stipulated that the brown substance was heroin and the white substance was cocaine.

The driver of the car was Charmeya Petty. She was driving a four-door, gray Honda Civic that she owned. Petty drove from work to pick up defendant in downtown Stockton. She saw defendant outside with some people, but just defendant and another individual got into her car. Defendant said he needed Petty to take him to Sacramento.

3

Defendant told Petty to drop them off. About 15 minutes later, defendant called and asked her to pick them up. Petty went back and saw defendant and the other person walking towards her car. Defendant got in the passenger seat and the other person got in the back seat behind defendant. Petty was leaving when the police appeared with lights and sirens. The police were shouting to put their hands up and she did. Petty noticed that the person in the back was "shuffling, like he was looking for something on the floor . . . ." Defendant had his hands up. The police asked them to get out of the car. Defendant got out first followed by the individual in the back and then Petty. Petty testified she did not know how drugs or a gun had been placed in the car.

An officer searched defendant and found $160 in cash in his front and back pockets. There were three twenties, five tens, nine fives, and five ones.

Later, police officers drove the guard in a patrol car to the scene and asked if any of the individuals looked familiar. The guard testified that he recognized one of them from the apartment complex. An officer later testified that the guard identified two males.

B

The prosecution introduced evidence of three prior incidents involving defendant.

A Stockton police officer testified that in 2009 the officer was engaged in surveillance of an area known for drug dealing when he observed defendant. Defendant shook hands with a homeless person, who then put his hand in his pocket, indicating to the officer that illegal activity was occurring. The officer approached defendant who agreed to be searched. The officer asked defendant if he had anything in his mouth. When defendant lifted and lowered his tongue quickly, the officer saw a piece of plastic under his tongue. The officer asked defendant to open his mouth again and defendant tried to swallow baggies of narcotics. Defendant eventually spit out 14 baggies that the officer recognized as containing cocaine. Defendant stated that the drugs were his but

4

later admitted that he was holding them for someone else. Defendant said he initially had 25 bags under his tongue. Defendant was 16 years old.

A Manteca police officer testified that in 2010 he stopped a car that defendant was driving because it did not have a front license plate. The officer searched the car and found a baggie of marijuana, a bag of pills that defendant admitted were Vicodin, and a Mentos container with six packages of rock cocaine. Pursuant to a search warrant, police searched defendant's residence and found a handgun, a hundred pills similar to those found in the traffic stop, and packages of cocaine. Defendant was arrested for sale of the pills and cocaine.

In 2014, another Manteca police officer testified that he stopped a car in which defendant was a passenger after it rolled through a red light. The officer recognized defendant and went back to the patrol car to determine if there were warrants for defendant's arrest. Defendant fled the car on foot. The officer pursued and saw defendant stop by some bushes. The officer found a handgun in the bushes and a magazine in some other bushes further on. Defendant was arrested for possession of a stolen firearm, possession of a loaded firearm in public, and being a felon in possession of a firearm.

C

Detective Gary Hallenbeck with the Yolo County Sheriff's Department testified as an expert on whether cocaine or heroin was possessed for sale or personal use and the methodology for selling those drugs. Detective Hallenbeck said drug dealers use juveniles to help sell drugs because they are impressionable and take direction, and if a juvenile is caught, the law is less strict than for an adult and a juvenile potentially will not go to prison for an extended period of time. Drug dealers commonly bring along another person as a bodyguard, who more than likely has a gun. A drug dealer involved in a transaction will know that his partner has a gun to protect him.

5

A phone that belonged to defendant had been seized and searched pursuant to a warrant. When shown a photograph taken from defendant's cell phone depicting handguns, Detective Hallenbeck testified that the photograph was consistent with someone selling drugs, as it served as a warning to others.

D

The jury convicted defendant of possession of cocaine and heroin while armed with a loaded firearm (counts 1 and 4, Health & Saf. Code, § 11370.1, subd. (a)), transportation of cocaine and heroin (counts 2 and 5, Health & Saf. Code, § 11352, subd. (a)), possession of cocaine and heroin for sale (counts 3 and 6, Health & Saf. Code, § 11351), and possession of a firearm by a felon (count 7, § 29800, subd. (a)(1)). The jury found true allegations that defendant was personally armed with a firearm in the commission of the offenses charged in counts 2, 3, 5 and 6 (§ 12022, subdivision (c)).

The trial court sentenced defendant to an aggregate prison term of 10 years eight months, consisting of the following: the middle term of four years on count 2 plus four years for the firearm enhancement, and one-third the middle term of 16 months on count 5 plus 16 months for the firearm enhancement. The trial court imposed a two-year concurrent sentence on count 7 and stayed sentences on the other counts under section 654.

DISCUSSION

I

The trial court denied defendant's motion to suppress the search of Petty's car. Defendant argues the trial court erred in finding that the information available to the officers was sufficient to justify the vehicle stop.

Officer Lang testified at the hearing on the motion to suppress.

While working traffic control for a River Cats game, Officer Lang overheard radio traffic in which police dispatch "advised that there were two suspicious males exiting the parking area of 777 5th Street, I believe it is called Capitol Place Apartments, that they

6

were walking out towards 5th Street. They had been seen around a stolen vehicle that was listed as armed and dangerous."

Officer Lang was a block away, so he responded to the call. As he turned and went towards that location, Officer Lang heard dispatch "give a description of these two suspicious subjects and state that the security guard for the apartment complex was following them out to 5th Street." The dispatcher advised that "the two subjects were described as male, black male adults, late teens, early 20s." The information Officer Lang had regarding their involvement in criminal activity was "that they were seen in or about the stolen vehicle that was in the parking area of the apartment complex" and there was a "flag caution . . . in the stolen vehicle system, CLETS that the vehicle is listed as armed and dangerous." The vehicle was listed "as taken in a carjacking with a firearm."

Officer Lang "observed a security guard on the sidewalk at the . . . south driveway of the apartment complex parking lot, and he was flagging me down or rather pointing me westbound on West Capitol Avenue." Officer Lang knew he was the security guard because of his uniform. Officer Lang looked in the direction the guard was pointing and "saw two black male adults matching the age, description given walking westbound on the sidewalk." Officer Lang radioed dispatch to advise other responding units that he "had eyes on the possible suspicious subjects and the security guard was pointing me towards their location."

Officer Lang was waiting for other units to arrive when he saw the suspects get in another vehicle that was exiting a former trailer park on West Capitol Avenue. This vehicle was a silver, four-door sedan driven by a black female adult. One of the males got in the front passenger seat and the other got in the left rear passenger seat behind the driver. The car started to roll forward when another officer arrived in a patrol car with emergency lights on and positioned his car to alert them that he was stopping them. Officer Lang assisted the other officer in conducting a "high risk traffic stop," meaning both officers drew their weapons based on the information received that "it was

7

considered an armed and dangerous stolen vehicle that was taken in a carjacking . . . ." Once the occupants of the car had been ordered out and the car cleared by a police dog, Officer Lang saw a handgun on the floorboard in the rear behind the right front passenger seat.

On cross-examination, Officer Lang testified that he saw the subjects walking swiftly but not running away from the apartment complex and he never saw them violate any law.

The trial court denied the motion to suppress, reasoning: "Here, we have the security guard who says, suspicious people, and also said the car was notable and that it didn't belong there and ended up getting towed, and dispatch showed that it was the subject of a carjacking. ¶ So people behaving in a manner that raises some suspicion in the security guard, near that car . . . ." The trial court said the arriving officers were directed to the individuals and it was appropriate to tell the suspects to stop for an investigation. The trial court said the stop occurred in a car, the officers saw a weapon on the floorboard of the car, and the search incident to the detention was appropriate as a result of all the information available to the officers.

" 'In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.' [Citation.]" (*People v. Silveria & Travis* (2020) 10 Cal.5th 195, 232 (*Silveria*).)

" '[T]he Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." [Citations.] "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." [Citations.] [¶] Because it is a "less demanding"

8

standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." [Citation.] The standard "depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act." [Citation.] Courts "cannot reasonably demand scientific certainty . . . where none exists." [Citation.] Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." ' " (*Silveria, supra*, 10 Cal.5th at p. 236, original italics, quoting *Kansas v. Glover* (2020) 589 U.S. __ [140 S.Ct. 1183, 1187-1188].)

"[A] mistake of law, though made in good faith, [cannot] not supply the reasonable suspicion necessary to justify a traffic stop. [Citations.] Conversely, ' "an officer's mistaken factual belief, held reasonably and in good faith, can provide reasonable suspicion for a traffic stop." ' [Citations.]" (*People v. Durant* (2012) 205 Cal.App.4th 57, 63.)

Reasonable suspicion to justify a stop " 'is dependent upon both the content of information possessed by police and its degree of reliability.' [Citation.] The standard takes into account 'the totality of the circumstances--the whole picture.' [Citation.]" (*Navarette v. California* (2014) 572 U.S. 393, 397 [188 L.Ed.2d 680].)

Defendant argues the information provided to Officer Lang was insufficient because the security guard did not report a crime but only " 'suspicious males' hanging around" a car that the CLETS system reported had been carjacked. Defendant asserts "[t]here was no reason to believe that the youths hanging around the parking lot were involved in the carjacking, or in any other criminal activity."

We disagree. To be sure, a security guard's report of "suspicious behavior" by individuals at the apartment complex, without more, would lack sufficient detail to support a reasonable suspicion that the individuals were involved in criminal activity. But here there was more. The guard thought the individuals by the pool were not residents and that they had some connection to the towed car. The dispatcher determined

9

that the car had been the subject of an armed hijacking. Whether true or not, defendant does not dispute that Officer Lang and other officers were entitled to rely on information received from dispatch that the security guard at the apartment complex reported two suspicious males were hanging around after a number of individuals had gotten out of a car that had been hijacked at gunpoint. (See *People v. Brown* (2015) 61 Cal.4th 968, 983 (*Brown*) ["An officer may arrest or detain a subject 'based on information received through "official channels" ' "].)

The timing and behavior of the individuals at the apartment complex combined with the report that the car had been hijacked at gunpoint warranted an investigation to determine if there was a connection. (*Brown, supra*, 61 Cal.4th at p. 986.) "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . ." (*In re Tony C.* (1978) 21 Cal.3d 888, 894; *In re H.M.* (2008) 167 Cal.App.4th 136, 145.) The reported crime was serious and defendant was leaving the scene where the hijacked car was found. "Police officers are required to make 'swift, on-the-spot decisions' and the Fourth Amendment does not require us to ' "indulge in 'unrealistic second-guessing' " ' of the officer's conduct." (*Brown,* at p. 984.)

Defendant further argues "officers stopped the silver sedan on the basis of the wholly inadequate description of the subjects as 'black male adults, late teens, early 20s.' " But Officer Lang received information from dispatch that the security guard had followed two males out of the complex; when Officer Lang arrived, the guard was pointing at two males. Officer Lang did not rely only on their physical description.

Defendant claims the security guard was not reliable because he was not known to Officer Lang and had not provided reliable information in the past, and the guard was not presumptively reliable as a citizen informant because he was neither a witness to, nor a victim of, a crime. The California Supreme Court held in *People v. Ramey* (1976)

16 Cal.3d 263 (*Ramey*) that as a general proposition, "private citizens who are witnesses to or victims of a criminal act, absent some circumstance that would cast doubt upon their information, should be considered reliable." (*Id.* at p. 269.)

Here, the trial court said *People v. Stanley* (2017) 18 Cal.App.5th 398 (*Stanley*) was instructive. In that case a bus driver reported to police dispatch that a passenger on the bus matched the description and photos of a child sexual assault suspect in a flier issued by the police department. (*Id.* at pp. 400-401.) The driver was not a witness to the assault but the appellate court nevertheless held that "he was a 'true citizen informant' because he voluntarily provided [police] with the information that appeared to link defendant to the crime." (*Id.* at p. 405.) "Unlike information provided by an anonymous tip, information from a true citizen informant is considered reliable because a citizen informant 'can be held responsible if [his] allegation turns out to be fabricated.' " (*Ibid.*, quoting *Florida v. J.L.* (2000) 529 U.S. 266, 270 [146 L.Ed.2d 254].) For the same reason, the guard in this instance was a presumptively reliable true citizen informant.

As defendant points out, such status does not dispense with the requirement that a citizen informant provide sufficient information to connect a suspect to a crime. (*Ramey, supra*, 16 Cal.3d at p. 269) However, we conclude the guard provided sufficient information of a connection to warrant a stop to investigate.

Defendant also notes that the presumptive reliability of a citizen informant " 'presupposes that the police be aware of the identity of the person providing information and of his status as a true citizen informant.' " (*Stanley, supra*, 18 Cal.App.5th at p. 405, quoting *Ramey, supra*, 16 Cal.3d at p. 269.) However, in *People v. Galosco* (1978) 85 Cal.App.3d 456, this court said "[w]e do not read this language in *Ramey* as requiring that the arresting officer verify the name of the citizen in order for the that person to be a 'true citizen informant.' " (*Id.* at p. 461.) In *People v. Superior Court (Haflich)* (1986) 180 Cal.App.3d 759, our court further explained: "Rather the police must have reason to believe, and in fact believe, the informant is truly

a citizen informant as opposed to a police informant. This belief and its reasonableness must be gathered from the surrounding circumstances one of which, mere name alone, is rarely relevant." (*Id.* at p. 768.) In *Haflich*, as here, such circumstances included that the citizen informant was physically present at the scene when he conveyed his information to the police and personally directed the police to the defendant's location. (*Ibid.*)

The totality of the circumstances was sufficient to create a reasonable suspicion that defendant's presence at the apartment complex was connected to the hijacked vehicle, allowing the officers to detain him to investigate.

II

Defendant next contends there was insufficient evidence to support the firearm enhancements because the prosecution presented no evidence that defendant had actual knowledge of the presence of the firearm and from its location the gun was not accessible to defendant. Defendant notes the gun was found in the backseat where J.O. was sitting, not in the front passenger seat where defendant was sitting. Defendant maintains only J.O. had knowledge of, and access to, the gun for purposes of section 12022, subdivision (c).[2] We disagree.

Section 12022, subdivision (c) imposes a sentence enhancement on a person who is personally armed with a firearm in the commission of a drug offense. " 'Whether a defendant used a firearm in the commission of an enumerated offense is for the trier of fact to decide. [Citation.] We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.' [Citation.]" (*People v.*

---

[2] Defendant relies on the prosecutor's statement in closing argument that "[t]here's really no other evidence that there would be anybody else that would have had access to this gun" but J.O. But "[t]he prosecutor's statements are not evidence, and they are not binding on the jury or the court. [Citations.]" (*People v. Leonard* (2014) 228 Cal.App.4th 465, 500.) Moreover, defendant misstates the prosecutor's argument. The prosecutor argued that no one *but* J.O. and defendant had access to the gun, J.O. was an armed juvenile helping defendant, and defendant "can just say give me that gun."

*Wilson* (2008) 44 Cal.4th 758, 806.)  We will affirm the jury's true finding supported by substantial evidence, reviewing the entire record in the light most favorable to the judgment to determine whether it discloses " ' "substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.]"  (*Ibid.*)

A defendant is "armed" within the meaning of section 12022 where the defendant has a weapon available for offensive or defensive use.  (*People v. Singh* (2004) 119 Cal.App.4th 905, 912.)  To be armed under section 12022, subdivision (c) does not require that a defendant have a firearm on his person.  (See *People v. Superior Court (Pomilia)* (1991) 235 Cal.App.3d 1464, 1472.)

Drug offenses such as Health and Safety Code sections 11351 and 11352, subdivision (a), are continuing crimes.  (*People v. Bland* (1995) 10 Cal.4th 991, 995.)  Evidence of proximity between the drugs and a firearm at some point when the defendant is physically present is sufficient for the jury to infer that defendant used a firearm during a drug crime.  (*Id.* at pp. 1003-1004; see *People v. Bradford* (1995) 38 Cal.App.4th 1733, 1737, 1739; *People v. Delgadillo* (2005) 132 Cal.App.4th 1570, 1572-1573, 1575; *People v. Pitto* (2008) 43 Cal.4th 228, 232-233, 240 (*Pitto* ); compare *People v. Jackson* (1995) 32 Cal.App.4th 411, 421-422.)

On cross-examination, defense counsel questioned Detective Watson, the detective who retrieved the handgun from the car, about defendant's access to the gun.

"Q.     From your observation in searching that car would it be correct that the person sitting in the passenger seat couldn't see it?

"A.     Where it was sitting at the time that I discovered it?

"Q.     That's it.

"A.     They wouldn't see it sitting in the passenger seat at the time that I discovered it.

"Q.     Right, yeah.  [¶]  And would it be difficult for the passenger to even reach it?

"A.     It would be a little difficult.  They'd have to reach around the seat to grab it."

Detective Watson's testimony that defendant in the front passenger seat could not see the gun where it was found on the floorboards in the backseat did not preclude the jury from reasonably inferring that defendant knew about the gun found in the same vehicle as the cocaine and heroin.  (*Bland, supra*, 10 Cal.4th at pp. 1002-1003.) Detective Hallenbeck testified that it is common for a drug dealer to be accompanied by a juvenile subject to more lenient criminal sanction acting as a guard and carrying a firearm.  Evidence that J.O., a juvenile, attempted to hide the handgun during the traffic stop fits this circumstance.  Detective Hallenbeck also testified that photos of guns on defendant's phone served as a warning that he would be armed during drug transactions. This evidence provided another basis for the jury to reasonably infer that defendant knew of the gun.

In any event, cases such as *Bradford, Delgadillo* and *Pitto* have not interpreted section 12022 to require unhindered access to a firearm.  Moreover, Detective Watson's testimony that a passenger in the front seat would have to reach around to grab the gun in the back seat supported the conclusion that the gun was within arm's reach of defendant. (*Pitto, supra*, 43 Cal.4th at p. 233 [officer testified that handgun in zippered pouch in cardboard box behind the driver's seat of minivan was within arm's reach of defendant driver].)

Further, defendant does not dispute that two people may be armed with one gun if it is accessible to both.  In *People v. Mendival* (1992) 2 Cal.App.4th 562, the court held, "we see no basis to limit applicability of the Penal Code section 12022, subdivision (c) enhancement to one individual if both individuals have a firearm available for their ready

14

access.  The firearm is there for purposes of offensive or defensive use.  It represents the same threat no matter which person grabs it." (*Id.* at p. 574.)

The jury properly found true that defendant was armed within the meaning of section 12022, subdivision (c).

III

Defendant contends his conviction for violation of Health and Safety Code section 11370.1 [possession of cocaine and heroin while armed with a loaded firearm] is also not supported by sufficient evidence.

When considering a challenge to the sufficiency of the evidence to support a conviction under Health and Safety Code section 11370.1, we review the record in the light most favorable to the judgment to determine whether it contains reasonable, solid and credible evidence upon which a jury could find the defendant guilty beyond a reasonable doubt.  (*People v. Johnson* (2015) 60 Cal.4th 966, 988.)

Health and Safety code section 11370.1, subdivision (a), provides that possession of controlled substances, including cocaine and heroin, "while armed with a loaded, operable firearm" is a felony.  By "armed," the statute means "having available for immediate offensive or defensive use." (*Ibid.*)

As with section 12022, being armed under Health and Safety Code section 11370.1 does not require defendant to have a firearm on his person.  (*People v. Superior Court* (*Martinez*) (2014) 225 Cal.App.4th 979, 990.)  Similarly, Health and Safety Code section 11370.1 does not require unhindered access to a firearm.  (See *People v. Molina* (1994) 25 Cal.App.4th 1038, 1043-1044.)  For the reasons we have concluded the jury correctly found true the section 12022 firearm enhancements, we likewise conclude that sufficient evidence supports defendant's conviction under Health and Safety Code section 11370.1.

Defendant cites *People v. Clark* (1996) 45 Cal.App.4th 1147 (*Clark*) as support for the argument that the firearm was not loaded because no shell was in a position from

15

which it could be fired.  Detective Watson testified that the handgun did not have a round in the chamber but the magazine contained its full capacity of seven bullets in the butt of the gun.  The court in *Clark* interpreted the term "loaded" into Health and Safety Code section 11370.1 to mean "a shell or cartridge has been placed in a position from which it can be fired" and it is not loaded "if the shell or cartridge is stored elsewhere and not yet placed in a firing position."  (*Clark,* at p. 1153.)

But *Clark* explained that a gun with rounds loaded in a magazine or clip is loaded for purposes of Health and Safety Code section 11370.1.  In *Clark*, the firearm was a single-shot shotgun with no shell in the firing chamber but three shells in a covered storage compartment in the rear of the stock.  To fire a shell, it would have to be removed by hand from the compartment and placed in the chamber.  (*Clark, supra*, 45 Cal.App.4th at p. 1152.)  The court contrasted that situation with the examples of how a firearm would have already been loaded in former section 12031 (now section 16840), i.e., where a shell is "in the firing chamber, magazine or clip . . . ."  (*Clark,* at p. 1154; see also section 16840, subdivision (b)(1) ["A firearm shall be deemed to be 'loaded' when there is an unexpended cartridge or shell, consisting of a case that holds a charge of powder and a bullet or shot, in, or attached in any manner to, the firearm, including, but not limited to, in the firing chamber, magazine, or clip thereof attached to the firearm"].)  The court concluded that the Legislature intended this "common meaning" of loaded applied to Health and Safety Code section 11370.1.  (*Clark,* at p. 1154.)

Defendant's contention lacks merit.

IV

Defendant also challenges his section 29800 conviction as lacking sufficient evidence that he possessed the firearm found in the vehicle.

Section 29800, subdivision (a)(1), provides:  "Any person who has been convicted of a felony . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony."

16

The parties stipulated to defendant's prior felony conviction for purposes of section 29800, subdivision (a)(1).

The question of knowledge and possession of a firearm by a felon is a question of fact for the jury and will not be disturbed on appeal if supported by substantial evidence. (See *People v. De Prima* (1959) 172 Cal.App.2d 109, 114; see also *People v. Burnett* (1967) 251 Cal.App.2d 651, 657.)

Possession of a firearm may be actual or constructive. (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831.) "Although the crime of possession of a firearm by a felon may involve the act of personally carrying or being in actual physical possession of a firearm, . . . such an act is not an essential element of a violation of [the statute] because a conviction of this offense also may be based on a defendant's constructive possession of a firearm. [Citations.] 'To establish constructive possession, the prosecution must prove a defendant knowingly exercised a right to control the prohibited item, either directly or through another person.' [Citation.]" (*People v. White* (2014) 223 Cal.App.4th 512, 524, italics omitted (*White*) [construing § 12021, subd. (a)(1), now § 29800, subd. (a)(1)].) A defendant may be in constructive possession even if others exercise control over the area where contraband is discovered, since control need not be exclusive. (*People v. Tolliver* (1975) 53 Cal.App.3d 1036, 1046.)

"[P]ossession of a firearm does not necessarily require that the possessor be armed with it." (*White, supra*, 223 Cal.App.4th at p. 524; see also *People v. Elder* (2014) 227 Cal.App.4th 1308, 1313-1314.) Defendant contends "the evidence was insufficient to support the elements of knowledge and possession, both of which are required for conviction," and incorporates his argument that there was insufficient evidence to support the jury's true findings on the section 12022 firearm enhancements, which requires knowledge and availability for use of a firearm. (*Bland, supra*, 10 Cal.4th at pp. 1002-1003.) We rejected that argument with respect to section 12022 and do so again for purposes of section 29800.

17

However, here, as in *People v. Buchanan* (2016) 248 Cal.App.4th 603, defendant's sentence enhancements for use of a firearm in the commission of drug offenses under section 12022 and being a felon in possession of firearm under section 29800 arose out of the same act on the same occasion with one weapon. (*Buchanan,* at p. 617; *People v. Jones* (2012) 54 Cal.4th 350, 357 (*Jones*).) Therefore, as this court held in *Buchanan*, the trial court could not properly impose separate sentences under sections 12022 and 29800. (*Buchanan,* at p. 617.) The trial court correctly imposed a section 12022 sentence on one of the drug counts and stayed the rest under section 654. (*Buchanan,* at p. 617.) However, the trial court should have also imposed and then stayed the sentence on section 29800, rather than impose a two-year sentence to be served concurrently. (See *Jones, supra*, 54 Cal.4th at p. 353 ["although there appears to be little practical difference between imposing concurrent sentences, as the trial court did, and staying sentence on two of the convictions . . . the law is settled that the sentences must be stayed to the extent that section 654 prohibits multiple punishment"].) We will modify the judgment to stay defendant's sentence imposed under section 29800.[3]

V

In addition, defendant contends the trial court abused its discretion in admitting evidence of his prior juvenile adjudications involving drugs and adult convictions involving guns under Evidence Code section 1101, subdivision (b).

In reviewing challenges to a trial court's evidentiary rulings for abuse of discretion, "we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted

_____

[3] The parties did not raise this issue in their briefs. Because the law appears clear, we have addressed it without further briefing in the interest of judicial economy. Any party aggrieved may petition for rehearing. (Gov. Code, § 68081.)

18

in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) A miscarriage of justice occurs if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

"Evidence Code section 1101, subdivision (a) 'prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." [Citation.] Among other matters, evidence of prior bad acts may be used to establish motive, intent, knowledge, identity, lack of mistake or accident, and the existence of a common design or plan. (Evid. Code, § 1101, subd. (b).) To be admissible, the evidence of the prior misconduct must be probative of a material fact. [Citation.]" (*People v. Washington* (2021) 61 Cal.App.5th 776, 787 (*Washington*).)

"Courts have recognized that evidence of other crimes is extremely inflammatory, and the trial court must take great care to evaluate its admissibility. [Citation.] The trial court must find that the evidence has substantial probative value that is not outweighed by its potential for undue prejudice." (*People v. Williams* (2009) 170 Cal.App.4th 587, 610 (*Williams*).)

As detailed in the factual background, the prosecutor presented evidence of defendant's three prior convictions involving drugs and/or guns under Evidence Code section 1101, subdivision (b). The trial court ruled that "with regard to the drug offenses certainly there was prior cocaine activity, and he certainly had sufficient knowledge of its nature and the argument that he keeps not knowing the substances are there at some point losses [*sic*] a fair amount of credibility . . . ." Defense counsel interjected that the evidence was "propensity" evidence, and the court responded, "it's propensity but it's

19

also . . . evidence of lack of mistake" and "has probative value as to whether or not [defendant] had possession of it in light of all the other evidence here, and to be able to say I didn't know it was there at some point rings a little hollow." The court concluded, "Is it prejudicial? Yes. Does that prejudice substantially outweigh its probative value? I think not with regard to the drugs."

The court ruled that evidence of the incident where defendant was the driver of a vehicle where shots were fired and another incident where defendant had possession of a gun and ran from a car while discarding it "has some probative value on the issue of certainly of lack of mistake. The court concluded, "I am going to allow it, and I am going to consider under [Evidence Code section] 352 whether or not the prejudice here substantially outweighs its probative value, and I'm going to find that the probative value is not substantially outweighed by its prejudice, so the 2014 event and the incident involving the shooting from 2011 will be allowed."[4]

Defendant argues the evidence of the juvenile drug adjudications was admitted to prove intent and lack of mistake, matters that were not at issue, and was immaterial to the relevant issue of whether he knew the drugs were in the car. As to the prior firearm conviction, defendant maintains the incident was too dissimilar to prove a material fact in the case. Defendant further asserts that the evidence was more prejudicial than probative under Evidence Code section 352, because "the probative value of the evidence was to show that appellant had some familiarity with drugs and guns," but "the evidence could not speak to the central issue in the case, which was whether appellant knew of the presence of the drugs or the gun in the vehicle in which he was riding."

" '[I]n narcotics prosecutions, evidence of prior drug convictions is relevant to

---

[4] While the trial court allowed evidence of the 2011 incident involving shooting with a pellet gun from a car driven by defendant, the prosecutor did not introduce evidence regarding this incident.

prove knowledge of the narcotic nature of the substance.' [Citation.]" (*Washington, supra*, 61 Cal.App.5th at p. 787; see also *Williams, supra*, 170 Cal.App.4th at p. 608.) Prior incidents involving a defendant where police officers found drugs and guns are relevant to the defendant's knowledge as well. (*Williams,* at pp. 606, 607.) In any event, defendant's contention that his prior convictions were not relevant to his knowledge of the presence of drugs and a gun in the car is unavailing. "Regardless of [defendant's] defense theory at trial, by pleading not guilty, he placed all elements of the crimes with which he was charged in dispute." (*Washington,* at p. 788.)

The People note that even if the other crimes evidence was improperly admitted, any error was harmless. We agree. The admissible evidence established that drugs and weapons were in close proximity to defendant in the car in which he traveled from Stockton to West Sacramento. Defendant asked Petty to drive him to Sacramento to visit his uncle and directed her to the apartment complex, but once there he gathered by the pool, wandered around the complex, and left. Petty said she had no knowledge of the drugs and gun in the car. The trial court instructed the jury the evidence of the prior incidents was admitted for a limited purpose, to consider the similarity or lack of similarity between the uncharged and charged offenses, not to conclude from the evidence that defendant was disposed to commit crime, and the People must still prove each charge and allegation beyond a reasonable doubt, regardless of defendant's prior offenses. We presume that the jury understood and followed this limiting instruction. (*Washington, supra*, 61 Cal.App.5th at p. 789; *Williams, supra*, 170 Cal.App.4th at p. 607.)

It is not reasonably probable that defendant would have obtained a more favorable result if evidence of his prior convictions had not been admitted.

### DISPOSITION

The judgment is modified to stay, under section 654, the sentence imposed on defendant for being a felon in possession of a firearm under section 29800.

The judgment is affirmed as modified.  The trial court shall prepare an amended abstract of judgment reflecting the modified judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

/S/
MAURO, J.

We concur:


/S/
ROBIE, Acting P. J.


/S/
KRAUSE, J.