Filed 9/30/22  P. v. Alfredo P. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALFREDO P.,<br><br>    Defendant and Appellant. | D079534<br><br><br>(Super. Ct. No. J243939) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard R. Monroy, Judge.  Affirmed.

Christine Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

In *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*), the United States Supreme Court held that the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigatory purposes if they reasonably suspect the individuals may be involved in criminal activity. (*Id.* at p. 30; see also *In re Tony C.* (1978) 21 Cal.3d 888, 893.) But what if the officers lack a reasonable basis for their suspicions, yet still attempt a detention? Theoretically, at least, targeted individuals can simply walk (or even run) away. Case law makes clear, however, that what they *cannot* do is respond to officers' verbal commands by assaulting them. An assault on a peace officer is an independent criminal offense, and an initial Fourth Amendment violation by the officer does not immunize the suspect for independent crimes committed thereafter.

In this case, Alfredo P. wore gang colors as he walked down the street one afternoon with three companions, prompting officers from the National City Police Department's gang unit to make a U-turn, approach the group, and order them to sit down. Rather than comply, Alfredo backpedaled and looked over his shoulder to run. He then abruptly changed course and charged at Officer Robert Rude, causing Rude to tackle him to the ground. A brief scuffle ensued, and Rude eventually handcuffed Alfredo. Patting him down, Rude discovered a loaded firearm tucked in his waistband.

Charged with resisting a peace officer (Pen. Code, § 69) and weapons offenses, Alfredo moved to suppress the recovered firearm as fruit of the poisonous tree.[1] The juvenile court denied his motion, concluding that while the initial stop was unlawful, Alfredo's decision to charge at Officer Rude dissipated the taint. As to the substantive charges, it found the prosecution had proven beyond a reasonable doubt that Alfredo resisted an executive

---

[1] Further undesignated statutory references are to the Penal Code.

2

officer while armed and possessed both a concealed firearm and live ammunition.

On appeal, Alfredo contends his suppression motion should have been granted and asserts his conviction for resisting an officer lacks evidentiary support. As we explain, both contentions rest on the flawed premise that Alfredo did not charge at the officer, but instead ran toward him in a panicked attempt to flee. Because the juvenile court reasonably found otherwise based on the officers' uncontradicted testimony and bodyworn camera footage, we conclude that any taint from the initial unlawful stop was attenuated, and that Rude was acting lawfully at the time Alfredo resisted his directives by force. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Police Contact and Search*

Around 3:30 p.m. on a sunny afternoon in June 2021, National City Police gang officers Ryan Mariota and Robert Rude were on vehicle patrol in their marked police car near Kimball Park, a known hangout for the Old Town National City gang. The officers were part of a proactive unit—their job was to be "nosy," and they were not responding to any calls reporting criminal activity. Members of the Old Town National City gang typically wear light blue clothing associated with North Carolina athletics, adopting its overlapping "NC" logo.

As the officers drove along D Avenue, they saw four juveniles, two male and two female. The two males wore North Carolina hats and bandannas, leading the officers to believe they were gang members who were " 'flying their colors' " and "could possibly be planning to go cause an act in the park" or "recruit or intimidate kids exiting National City Middle School." They were primarily focused on the males because of their clothing and the

3

neighborhood they were in. But they acknowledged the group was just walking down the street, and that the two girls were not wearing gang colors. At one point Alfredo noticed the patrol vehicle and looked back toward the car before continuing walking.

The ensuing events were captured on Officer Rude's bodyworn video camera. The officers wanted to speak to the males "to deter them from committing any sort of crime just in case a crime was about to occur." They made a U-turn to pull alongside them and stopped the patrol vehicle. Officer Rude, who was riding in the passenger seat, stepped out and immediately directed the group to sit down. Three of the four minors seemed to listen, but Alfredo placed his hand near his waistband and started walking backwards while looking behind him. As Alfredo backpedaled from a distance 10 to 15 feet away, Rude told him to "sit the fuck down," using the expletive to convey that he was being serious. Alfredo looked back over his shoulder, as if wanting to run.

Officer Mariota circled out to the left of Alfredo. Alfredo then looked forward, grabbed his waistband, and charged directly toward Officer Rude. The officers were concerned, unsure what was in his waistband or whether he was trying to hurt them.

As Alfredo rushed at him, Rude wrapped his arms around Alfredo and flung him onto the pavement. The two tussled for 10 to 15 seconds on the ground until Rude was able to restrain Alfredo in handcuffs. During that brief time, Rude used his legs to pinch Alfredo's arms to his side. He called for backup, told Alfredo to place his hands behind his back, and eventually handcuffed him. Both sustained minor injuries from the encounter—Alfredo was cut on his nose, while Rude suffered a cut on his hand and a ruptured bursa sac in his elbow.

Once Alfredo was placed in restraints, Rude lifted and moved him to the front of the patrol vehicle. Believing he was a gang member and that gang members were often armed, Rude did a patdown search (or patsearch). Near Alfredo's waistband, Rude felt what he believed to be the handle of a firearm. Lifting Alfredo's shirt, he located a loaded semiautomatic ghost gun.[2] There were five live 9mm bullets in the magazine, and both the firearm and ammunition appeared to be in operable condition.

B. *Subsequent Proceedings*

The San Diego County District Attorney filed a petition under section 602 of the Welfare and Institutions Code alleging that 15-year-old Alfredo unlawfully resisted an executive officer while armed with a firearm (§§ 69, 12022, subd. (a)(1), count 1), possessed a concealed firearm (§ 29610, count 2), and possessed live ammunition (§ 29650, count 3). Alfredo moved to suppress any observations, statements, or evidence concerning the firearm or ammunition, arguing they were recovered as the fruit of an unlawful detention. (Welf. & Inst. Code, § 700.1.)

At a consolidated hearing in August 2021, the court considered the suppression motion and held the adjudication hearing. The People examined officers Mariota and Rude, who testified about the events and played bodyworn camera footage.[3] Alfredo cross-examined both witnesses but did not present any affirmative evidence.

---

[2] As Rude explained, a "ghost gun" lacks a serial number for tracing and has a handle and rail made from polymer rather than metal.

[3] The video largely matched the officers' testimony but highlights how quickly events transpired. After Mariota makes a U-turn, Rude places his hand on the passenger door lever. Opening the door and jumping out, Rude immediately commands the teens, "Hey, what's going on? You guys have a

After both sides rested, the court pronounced its tentative ruling to deny the motion to suppress. It noted on the record that it was glad Officer Rude remained in the courtroom because it believed Alfredo was detained without reasonable suspicion the moment Rude exited his vehicle and commanded the four to sit down. Had Alfredo complied and the weapon was discovered thereafter, "that would have been a successful suppression motion." Instead, the court explained, Alfredo "quite frankly, went into punk mode and decided he was going to crazily charge the officer. And the officer had to respond the way he did. Once the officer did, he patted down [Alfredo] lawfully after that detention and found the weapon." Comparing the case to *In re Richard G.* (2009) 173 Cal.App.4th 1252 (*Richard G.*), the court reasoned that an unlawful detention did not give Alfredo license to commit a crime against the officer.

Defense counsel maintained that "the only reason Alfredo ran was because two officers were going toward him." Just fifteen years old and

---

seat for me right here." Four minors then come into the frame—two males are walking down the sidewalk in front, with two females carrying backpacks walking behind them. Rude repeats his command to sit down, and when Alfredo talks back, directs him to "sit the fuck down." Mariota by this point exits the driver's side door and approaches Alfredo from the left side of the video frame. Alfredo appears to walk backwards away from Rude, showing his hands. He then abruptly changes his stance and charges directly at Rude, who was standing about 10 feet away. The video is hard to make out as Rude brings Alfredo to the pavement, face down, and directs him to put his hands behind his back. After using his radio to ask the next unit to "step it up" Rude again tells Alfredo to put his hands behind his back and places them in restraints. The whole encounter took about 40 seconds. Alfredo's act of charging at Rude took just two seconds, while the tussle in bringing him under control on the pavement took just four seconds. The major factual discrepancy between the officer's testimony and the video is in what Alfredo did with his hands in charging at Rude. It is not apparent in the video that Alfredo clutched his waistband as both Mariota and Rude suggested.

facing his first delinquency petition, he panicked and ran. In counsel's view, he would not have run but for the unlawful stop; "[w]hat happened after is a fruit of those decisions by the officers." Counsel urged the court to grant the motion to convey to police officers that they could not unlawfully detain an individual for simply wearing gang clothing or walking in a gang neighborhood.

Disagreeing that suppression was required, the court denied the motion. Although there was no reasonable suspicion at the outset to detain the minors, it believed Alfredo's decision to charge at Officer Rude changed the analysis.

Turning to the substantive charges, defense counsel reminded the court that the People bore a different burden of proof for adjudication. Counsel argued there was insufficient evidence by which the court could conclude that the officers acted lawfully in detaining Alfredo. The prosecutor responded that once Alfredo charged Officer Rude, there was *probable cause* to detain him, and no excessive force was used. The court agreed with the prosecution, found all allegations in the petition true, and adjudged Alfredo a ward pursuant to Welfare and Institutions Code section 602. It placed Alfredo on home supervision for 30 days subject to various terms and conditions.

## DISCUSSION

Alfredo contends the trial court erred in denying his suppression motion, suggesting the recovered firearm and ammunition were fruits of his unlawful detention. He further claims there was insufficient evidence to support his conviction under section 69 for resisting an officer because the officers were not *lawfully* performing their duties. We reject both claims, which rest on the flawed premise that Alfredo was not trying to charge at Officer Rude but instead was attempting to flee.

7

A.    *Suppression Motion*

"In reviewing a suppression motion, the trial court is vested with the power to assess witness credibility, resolve evidentiary conflicts, weigh the evidence and draw factual inferences; its findings are upheld on appeal so long as they are supported by substantial evidence." (*In re Edgerrin J.* (2020) 57 Cal.App.5th 752, 759.) "However, we exercise our independent judgment in determining whether on these facts the challenged search or seizure complied with the Fourth Amendment." (*Edgerrin J.,* at p. 759.)

Where evidence is discovered during an illegal detention, it must ordinarily be suppressed as " 'fruit of the poisonous tree.' " (*Wong Sun v. United States* (1963) 371 U.S. 471, 487−488.)  But evidence is not " 'fruit of the poisonous tree' " merely because it would not have come to light but for illegal actions by the police. (*Ibid.*) "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Id.* at p. 488; accord *People v. Brendlin* (2008) 45 Cal.4th 262, 268 (*Brendlin*).)  As relevant here, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not have been served by suppression of the evidence obtained.' " (*Utah v. Strieff* (2016) 579 U.S. 232, 238 (*Strieff*).)

In evaluating attenuation, courts look to three factors—the time interval between the unconstitutional conduct and the discovery of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the official misconduct.  (*Strieff, supra,* 579 U.S. at p. 239, citing

8

*Brown v. Illinois* (1975) 422 U.S. 590, 603−604; see *Brendlin, supra,* 45 Cal.4th at p. 268 [also citing *Brown*].) Applying those factors here, we agree with the trial court that Alfredo's decision to charge at Officer Rude attenuated the taint from the initial unlawful stop.[4]

First, the firearm was recovered shortly after Officer Rude's suspicionless detention. This temporal proximity is often found in cases involving resistance to police and while it weighs in favor of suppression, it is not dispositive. (*Brendlin, supra,* 45 Cal.4th at p. 270.)

By contrast, the second factor weighs heavily against suppression. Alfredo's decision to charge at Officer Rude signaled an independent criminal act after the unlawful detention and before the seizure of the firearm. As a factual matter, Alfredo strenuously disagrees that he *charged* at Officer Rude, suggesting he was merely attempting to *flee*. But the juvenile court considered the same contention and rejected it in finding Alfredo charged at Rude. The court's finding was supported by the uncontradicted testimony of Mariota and Rude as well as bodyworn camera footage.

This key fact distinguishes the cases on which Alfredo relies. In *Badillo v. Superior Court* (1956) 46 Cal.2d 269, 273, officers unlawfully entered a

---

4       We reject the People's suggestion that Alfredo was not detained until he was tackled. A detention occurs when, in view of all attendant circumstances, a reasonable person would not have felt free to leave, and the person actually submits to the show of authority. (*People v. Brown* (2015) 61 Cal.4th 968, 974.) Despite Alfredo's failure to follow orders, he did not run. Backpedaling and looking over his shoulder (as if to *escape*) while two officers walked toward him from 10 to 15 feet away, Alfredo sufficiently submitted to the officers' show of authority as required under *California v. Hodari D.* (1991) 499 U.S. 621, 626−627. His conduct is distinguishable from that of the minor in *Hodari,* who ran on seeing police approach in an unmarked vehicle, tossing away a small rock of crack cocaine as officers chased him. (*Id.* at pp. 622−623.)

house, prompting the defendant to run out the front door, dropping a packet of heroin as he fled. Alfredo likewise cites *In re Michael V.* (1974) 10 Cal.3d 676, 681 to suggest that flight in response to an unlawful detention does not furnish cause to detain. None of his cases involved a defendant who *charged* at an officer rather than merely fleeing after an unlawful stop.

Alfredo suggests he never would have run at Officer Rude had he not been unlawfully detained. But an illegal detention does not give a defendant license to commit a separate crime. (See *Richard G., supra,* 173 Cal.App.4th at p. 1262; *People v. Cox* (2008) 168 Cal.App.4th 702, 711–712 (*Cox*).) Alfredo's decision to charge at Rude amounted to an intervening circumstance that did not inevitably follow from the unlawful detention.

*Richard G.* is instructive. A minor was detained on an anonymous tip of a disturbance possibly involving a handgun. Refusing to obey police commands, he threatened to harm one of the officers and resisted and punched an officer who tried to grab him. (*Richard G., supra,* 173 Cal.App.4th at p. 1256.) The appellate court concluded there was reasonable suspicion to detain the minor based on the tip. As an alternative basis to deny the suppression motion even if the initial detention had been improper, the court explained that "[a]n individual's decision to commit a new and distinct crime, even if made during or immediately after an unlawful detention, is an intervening act sufficient to purge the 'taint' of a theoretically illegal detention." (*Id.* at p. 1262.) The court noted that the exclusionary rule would not, for example, "operate to exclude testimony that an unlawfully arrested person shot the arresting police officer." (*Id.* at p. 1261.) This is because where a police officer sees defendant committing a new crime at the same time he is subjected to an unlawful detention, the new criminal

behavior "breaks the causal link between any constitutional violation and evidence of the new crime." (*Id.* at p. 1262.)

*Cox* reached a similar result. Sacramento police detained a pedestrian without reasonable suspicion based on an erroneous understanding of applicable law. (*Cox, supra,* 168 Cal.App.4th at pp. 706, 708.) The defendant refused to comply with police orders, locking his elbows and resisting the officer's attempts to search him. (*Id.* at p. 706.) In the ensuing struggle, he escaped from officers' grip, fled, and attempted to punch an officer who gave pursuit. The defendant tripped and fell on his face, allowing officers to catch up to him and eventually handcuff him. (*Ibid.*) He was then charged with resisting an executive officer in the performance of his duties. (*Ibid.*) Explaining why the trial court properly denied defendant's motion to suppress, the court explained "it would be a curious use of language to say that the officers' detention of defendant (illegal though it might have been) *procured* the officers' subsequent observations of his resistance to arrest." (*Id.* at p. 712.) "[D]efendant's reaction here to being detained was not inevitable, but an independent decision he himself made, amounting to an intervening circumstance that cured the taint." (*Ibid.*)

Alfredo's decision to charge at Officer Rude amounted to an intervening criminal act, breaking the causal chain between the unlawful stop and the seized evidence. Here, as in *Richard G.* and *Cox*, an initial unlawful stop did not give Alfredo license to commit an independent criminal act.[5]

---

[5] Alfredo's attempts to distinguish *Richard G.* and *Cox* are unpersuasive. Although there was reasonable suspicion to justify the stop in *Richard G.*, the court addressed attenuation as an alternative ground. It is likewise immaterial that Alfredo did not punch, threaten, or assault any officer—by charging at Officer Rude, he created legal justification for the stop and subsequent patsearch Finally, as the People suggest, *People v. Garry* (2007) 156 Cal.App.4th 1100 is not on point because it did not consider whether a

Finally, we turn to the third attenuation factor, the flagrancy and purposefulness of the police misconduct. This factor "is generally regarded as the most important because 'it is directly tied to the purpose of the exclusionary rule—deterring police misconduct.' " (*Brendlin, supra,* 45 Cal.4th at p. 271.) Exclusion is warranted "only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." (*Strieff, supra,* 579 U.S. at p. 241.)

Here, as in *Strieff*, Officer Rude "was at most negligent." Observing suspected gang members in gang territory after school let out and seeking to deter a crime at Kimball Park, he could have simply asked the minors whether they were willing to speak with the officers rather than ordering them to sit down. (*Strieff, supra,* 579 U.S. at p. 241.) While Rude's decision to initiate the stop was unjustified, his conduct after the detention was lawful. Alfredo's decision to charge at Rude while clutching his waistband gave officers reasonable suspicion to detain him by tackling him to the ground. The subsequent patsearch was justified by officers' reasonable fear that Alfredo was armed and intended to hurt them as he charged. (*Terry, supra,* 392 U.S. at pp. 27, 29; see generally *In re Jeremiah S.* (2019) 41 Cal.App.5th 299, 304−305 [patsearches must be supported by specific and articulable facts that give rise to reasonable suspicion that the defendant is armed and dangerous].) Thus, although Officer Rude lacked reasonable suspicion to make the initial stop, his actions until the moment Alfredo

___

scuffle between the defendant and officer dissipated the taint of an unlawful detention. (*Id.* at p. 1112.) *Garry* is also distinguishable on the facts: the police officer "all but ran directly at [the defendant], covering 35 feet in just two and one-half to three seconds, asking defendant about his legal status as he did so." (*Ibid.*) The defendant initially took a few steps back and resisted only after the officer "reached out and grabbed him." (*Id.* at p. 1104.)

charged at him amounted to a negligent rather than purposeful or flagrant abuse of power.

All in all, the first factor supports suppression while the remaining two strongly favor attenuation. On balance, the trial court properly found that the taint of the Fourth Amendment violation from the initial detention was attenuated by Alfredo's independent decision to charge at Officer Rude. Accordingly, the firearm and ammunition recovered pursuant to the patsearch did not need to be suppressed.

B.    *Sufficiency of the Evidence*

Even if his suppression motion was properly denied, Alfredo argues there was nonetheless insufficient evidence to support his conviction on count 1 for resisting a peace officer. Section 69 applies to " '[e]very person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty . . . .' " Although the accusatory pleading alleged both types of offenses under section 69, Alfredo was prosecuted under only the second prong, for resisting Officer Rude by force or violence. Noting that resisting an officer requires proof beyond a reasonable doubt that an officer's actions were *lawful* (see *In re Manuel G.* (1997) 16 Cal.4th 805, 816), Alfredo maintains "there was no substantial evidence that he failed to obey a lawful directive, or did so by the use of force or violence."

An officer is not lawfully performing his duties when he detains an individual without reasonable suspicion. (*Garcia v. Superior Court* (2009) 177 Cal.App.4th 803, 818–819.) Focusing on the initial detention, Alfredo maintains the officers lacked reasonable suspicion when they exited their vehicle and ordered him to sit down. Conceding that the trial court found

that there was sufficient basis to detain him after he decided to charge at Officer Rude, Alfredo nonetheless "maintains that he was simply trying to run away and the only reason he ran into the officer was because the officer was directly in front of him, walking toward him."

This argument fails given our standard of review. In evaluating a conviction for sufficiency of the evidence, we do not reweigh the evidence, make credibility determinations, or substitute our interpretation of the facts for that of the trial court. Instead, we look to the record to determine whether, viewed in the light most favorable to the verdict, *any* rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

Because assaulting an officer is a separate crime, Officer Rude had reasonable suspicion to detain Alfredo the moment he charged. Once Alfredo was brought to the ground, the two tussled while Rude attempted to restrain him. Rude radioed for backup, advising fellow patrol and gang enforcement officers that he was dealing with a noncompliant individual. Eventually, he was able to place Alfredo in handcuffs. Rude sustained minor injuries in the altercation. Viewing this evidence in the light most favorable to the judgment, the trial court could conclude that Rude reasonably believed he was the victim of an attempted assault. Thereafter, he acted lawfully in tackling Alfredo to detain him, but Alfredo resisted this lawful detention by force or violence. (See *People v. Bernal* (2013) 222 Cal.App.4th 512, 519 ["force used by a defendant *in resisting* an officer's attempt to restrain and arrest the defendant is sufficient to support a conviction"].)

Challenging this result, Alfredo cites *People v. Southard* (2021) 62 Cal.App.5th 424 (*Southard*). *Southard* found reversible error where the

court's jury instruction suggested that an intervening act by the defendant could remove any taint from unlawful police conduct. (*Id.* at pp. 433–435.) By introducing inapplicable standards related to motions to suppress, the trial court eliminated one of the elements the prosecution had to prove—i.e., that police were acting lawfully when the defendant allegedly resisted arrest. (*Id.* at pp. 434–435.)

Alfredo speculates that the trial court relied on *Richard G.* "not only as a basis for denying appellant's motion to suppress but also as a reason to find that appellant violated Penal Code section 69." Thus, although this case involved a juvenile adjudication rather than a jury trial, he likens it to *Southard* and claims reversible error occurred. We are not persuaded.

As the People note, defense counsel made a comment immediately following the court's suppression ruling that a higher beyond a reasonable doubt standard applied to adjudicate the substantive charges. She argued that under that standard, the court should not find that the police acted lawfully. The court rejected that argument, agreeing with the prosecutor that "everything that the officer did was legal once [Alfredo] charged at [him]." Given this record, we are hard pressed to conclude the court was confused as to the applicable standard or employed irrelevant concepts governing attenuation of Fourth Amendment violations in evaluating the substantive resisting arrest charge. Because the record amply supports the court's conclusion that Officer Rude acted lawfully in restraining Alfredo once Alfredo charged at him, the ensuing scuffle amounted to a violation of section 69.

## DISPOSITION

The judgment is affirmed.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DO, J.