Filed 12/30/24  P. v. Fields CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TRAVIS ANDALE FIELDS,<br><br>    Defendant and Appellant. | A168364<br><br>(San Francisco City & County Super. Ct. Nos. SCN 234699, CT 21010692) |

A jury convicted defendant Travis Fields of two counts of burglary after a group of men stole a garage-door opener from the victims' vehicle and used it to access their home.  Fields was sentenced to four years in prison.  On appeal, his only claim is that his cell phone records should have been suppressed because they were obtained in violation of the Fourth Amendment and California's Electronic Communications Privacy Act (Pen. Code, § 1546 et seq.) (ECPA).[1]  We affirm.

---

[1] All further statutory references are to the Penal Code.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Burglary of the R.s' Vehicle and House*

The R.s, a married couple, lived with their adult son (son) in a house on Paris Street in San Francisco. The house, which is on a hill, has two stories that extend front to back and a third, bottom story in the back only. Most of the living area, including a guestroom and the couple's bedroom, was on the top story, with the garage and family room on the middle story and son's bedroom on the bottom story.

Sometime after 9:00 a.m. on the morning of September 2, 2021, the R.s left to go shopping while son was still asleep. They drove their SUV to the South San Francisco Costco, about 20 minutes away. After shopping in the Costco for an hour, the couple returned to their SUV to find it had been "vandalized." Both passenger's-side tires were slashed, and the front passenger's window was broken. The only thing missing from the SUV's interior was their garage-door opener, which had been on the driver's visor. The R.s called the police and unsuccessfully tried to get in touch with son.

Son testified that meanwhile, while he was in his bedroom that morning, he heard footsteps from above that sounded heavier and more "hurried" than those of his parents. He then heard someone descending the stairs to his room. The person paused, and son opened his bedroom door to see who was there. A pistol was "immediately pointed in [his] face" by a man standing outside the door. The man was about five feet, nine or ten inches tall, Black, and in his late twenties or thirties, and he was wearing a black hoodie, jeans, gloves, and a surgical face mask. He pushed son backward and told him to sit on the bed. He then took son's cell phone.

2

Meanwhile, another Black man, who was around the same height and age as the first and also wearing a black hoodie and a face mask, came into son's bedroom. The first man handed son's cell phone to the second man, who looked around and then exited the room. The first man, still pointing the pistol at son, started to communicate with someone on "a walkie-talkie of some kind." It seemed like the man was talking in code, since he was using the word "red" or other colors "to describe a situation." Son could hear the person on the other end of the device using similar code words.

Son testified that at some point, a third man who was also in his late twenties or thirties and "larger than the first two in stature" entered the bedroom.[2] The third man also had on a hoodie, gloves, and a face mask. After surveying the room, he left. Eventually, about 10 minutes after entering son's bedroom, the first man backed out of the room and shut the door. Son waited about 30 seconds before jumping through his window and running up to the street. He did not see any of the men who had been in his house, but a door next to the house's main garage door was open. The family did not normally leave that door open, and son made sure every night that all the exterior doors were locked.

Upon returning home later that day, Mrs. R. observed that her and her husband's bedroom and the guestroom had been ransacked. Her jewelry and watches, worth about $50,000, were gone, as well as several designer handbags and $3,000 in cash. Son eventually noticed that in addition to his cell phone, his watch, which was worth about $450, and his wallet had been stolen.

---

[2] Son did not clearly testify to this person's race. Fields, who is Black, was 39 years old at the time of the crimes, and his driver's license reflected he was six feet tall and weighed about 200 pounds.

## B. The Police Investigation

A South San Francisco police officer obtained surveillance footage of the Costco parking lot from the relevant timeframe. The footage showed the R.s park their SUV. "[M]inutes later," a dark-colored "newer Cadillac sedan" appeared in the parking lot. The Cadillac drove around the lot for at least 10 minutes before parking around 10:39 a.m. A person then exited the Cadillac and walked toward the R.s' SUV, staying there for "several seconds" before returning to the Cadillac. The Cadillac resumed driving through the lot and parked again a few minutes later. This time, two people exited the Cadillac and approached the SUV. At one point, one of them crouched by the SUV's front passenger's-side tire. Both people then returned to the Cadillac, which exited the parking lot at around 10:50 a.m.

Surveillance footage from a neighbor of the R.s showed that about 25 minutes after the Cadillac left Costco, a different black car parked on Paris Street in front of the R.s' house. The R.s' garage door immediately opened. Two people then got out of the black car and entered the R.s' garage, and the garage door closed after them. Approximately 20 minutes later, two people exited the R.s' house through the "sliding garage door exit" and put some items in the trunk of the suspect car, which drove away.[3]

The Costco surveillance footage showed the first digit and last three digits of the Cadillac's license-plate number. The South San Francisco police officer disseminated this information and a still photograph of the Cadillac to local law enforcement agencies. A California Highway Patrol officer with access to data from a license-plate reader on the eastbound portion of the Bay

---

[3] Despite the fact that this footage showed only two people get out of and back into the black car, son insisted he was "positive" that three different men entered his bedroom.

4

Bridge received the bulletin and, on September 7, 2021, conducted a "wildcard search" with the partial plate number. The search returned 48 results, including "what appeared to be a black Cadillac" driving eastbound on the Bay Bridge at 12:03 p.m. on September 2, less than an hour after the Paris Street burglary. The CHP officer then performed a search of the Cadillac's full license-plate number for the preceding month, which showed that the Cadillac also traveled eastbound across the bridge on the night of August 31 and the afternoon of September 7.

A records check revealed that a Cadillac with that license plate was registered to Fields at a Stockton address. A felony hold was placed on the vehicle. On September 14, 2021, an Oakley police officer on patrol was notified that a license-plate reader had picked up a vehicle with that plate entering the city, and he quickly found the Cadillac parked behind an apartment building. As the officer walked toward the Cadillac, Fields approached and asked whether "he was parked in the wrong spot." The officer detained Fields and found the key to the Cadillac in his pocket. Fields also provided his phone number.

Sergeant Christopher Servat, the San Francisco police officer assigned to investigate the Costco and Paris Street burglaries, obtained a search warrant for the cell phone records of the number Fields provided. AT&T, the service provider, produced records showing that Fields was the subscriber for that phone number at the same Stockton address where the Cadillac was registered.

An expert in cell phone forensics and analysis testified about the call detail records AT&T also provided, which included information about the cell phone's location when it was used. These records showed that on the morning of September 2, 2021, Fields's cell phone traveled from Stockton to

5

Pleasant Hill. It then traveled across the Bay Bridge into San Francisco, where it received an incoming call near the Paris Street house at 10:11 a.m. Next, the phone registered in the same area as the South San Francisco Costco at 10:48 and 10:52 a.m., around the time the Cadillac left the Costco parking lot.

Fields's cell phone then returned to the same area as the Paris Street house, where it made an outgoing call at 11:16 a.m. The call lasted for nearly 19 minutes. The phone then traveled back to the East Bay, leaving San Francisco shortly before noon. By 5:20 p.m., the phone had returned to the Stockton area, and it was still in that area around 11:30 p.m. that night.

The expert also described call detail records tending to show that the cell phone was in Fields's Cadillac when (1) the car was registered crossing the Bay Bridge on September 7, 2021, and (2) Fields was detained in Oakley on September 14.[4]

C.    *Procedural History*

The operative information charged Fields with four felonies: first degree residential burglary, first degree residential robbery, false imprisonment, and second degree vehicular burglary.[5] It was alleged that the residential burglary was a violent felony because a person other than an accomplice was present in the residence. In connection with the robbery, it was alleged that Fields acted in concert with two or more people and a principal was personally armed with a firearm. Finally, it was alleged that

---

[4] The expert testified that there were insufficient records from August 31, 2021, the remaining day the Cadillac was registered crossing the Bay Bridge, to indicate whether the cell phone was in the car at that time.

[5] The charges were brought under sections 459 (burglary), 211 (residential robbery), and 236 (false imprisonment).

Fields was released on bail in two other cases when he committed the charged offenses.[6]

Fields was originally tried in August 2022. The trial court declared a mistrial after the jury announced it was deadlocked. At a retrial the following June, the new jury acquitted Fields of robbery and false imprisonment and convicted him of both burglary charges. It also found true that he committed the residential burglary when someone other than an accomplice was present. After the prosecution dismissed the bail allegation based on one of Fields's other cases, the trial court found true the remaining bail allegation.

In July 2023, the trial court sentenced Fields to a total of four years in prison, composed of the midterm of four years for residential burglary and a concurrent term of two years for vehicular burglary. It also struck the bail enhancement in the interest of justice.

## II.
## DISCUSSION

Fields claims that the AT&T search warrant lacked probable cause to support a search of *any* of his cell phone records. He also claims that even if there was probable cause to support a limited search, the warrant was overbroad in covering "six weeks of data" despite the fact that "the entirety of the crimes involved 65 minutes on one day."

We conclude there was sufficient probable cause to support the warrant. And we conclude that even if the six-week period was excessive, the only records actually introduced at trial were seized under a portion of the

---

[6] The enhancement allegations were made under sections 667.5, subdivision (c)(21) (violent felony), 213, subdivision (a)(1)(A) (acting in concert), 12022, subdivision (a)(1) (armed principal), and 12022.1, subdivision (b) (bail).

warrant that was not overbroad.[7]  The trial court therefore did not err by denying Fields's motion to quash the warrant and suppress the cell phone evidence.

### A.    Additional Facts

#### 1.    The warrant

On September 15, 2021, the day after Fields was detained in Oakley and provided a phone number, Sergeant Servat sought and obtained a search warrant for all of AT&T's account and subscriber information for that number between August 1 and September 15.  The information sought included "Call Detail Records With Cell Site Data . . . showing both incoming and outgoing calls and SMS (no content)" and "Per Call Measurement Data . . . showing the approximate location of the cellular device[] at the time of usage."

In his affidavit of probable cause, Sergeant Servat described the burglary of the R.s' SUV and house.  According to the affidavit, Mr. and Mrs. R. left their house around 10:30 a.m. on September 2, 2021, and drove to the South San Francisco Costco.  When they returned to their vehicle, it had been broken into, their garage door opener was missing, and the vehicle's tires were slashed.  Costco surveillance footage showed a "black newer model Cadillac XTS sedan" enter the parking lot at 10:38 a.m.  The Cadillac drove around the parking lot for about 10 minutes, passing several open spots, and parked next to the R.s' vehicle.  According to the affidavit, "two subjects exit[ed] the Cadillac, . . . approach[ed] the victim vehicle[, and] . . . appear[ed] to be looking in [it]."  The Cadillac then left.  Sergeant Servat averred that he

---

[7] As a result, we need not address Fields's remaining arguments that (1) the constitutional good-faith exception does not save the warrant from being overbroad and (2) suppression is independently required under ECPA even if the exception applied.

"believe[d] the occupants of the Cadillac broke into the [victims'] vehicle, stole the garage door opener, and vandalized it."

The affidavit also stated that surveillance footage from the R.s' neighborhood showed "a black newer model Honda" park in front of their house at 11:15 a.m., about 25 minutes after the Cadillac left Costco. The R.s' garage door then opened, and "two suspects enter[ed]." The affidavit described the ensuing robbery of son, including his observation of three suspects, one of whom "appeared to be on the phone with someone." About 20 minutes later after entering the home, "the two suspects exit[ed] carrying bags" and got into the Honda, which left the scene.

In addition, the affidavit described the process by which the Cadillac and, in turn, the cell phone number to which the warrant pertained were tied to Fields. Sergeant Servat stated that he was eventually able to determine the Cadillac's full license-plate number from the Costco surveillance footage. He then learned that "the same vehicle from the Costco incident" was captured driving on the Bay Bridge on both September 2 and 7, 2021. After running a records check, Sergeant Servat discovered that the Cadillac was registered to Fields at a Stockton address and that the phone number registered to him was the one the warrant covered. When the Oakley police officer located the Cadillac, Fields approached the officer, confirmed the Cadillac was his, and provided the same phone number.

According to the affidavit, Fields had "numerous arrests for armed robbery and burglaries" and was "out on bail for an active court case . . . for a home invasion burglary in San Francisco." Sergeant Servat stated that in light of Fields's criminal history and open burglary case, as well as the fact "that his registered vehicle was involved in the armed home invasion robbery [on] . . . Paris Street," he "believe[d] that Fields [was] involved in the

9

incident." Finally, the sergeant explained as follows why he sought the cell phone records: "I know, from my training and experience, that suspect[]s will keep their cellphones on them during the commission of crimes, as it is common for suspect[]s engaged in criminal activity and the average member of the public to always have their cellphones on their person when in public. I also know that suspects involved in criminal activity will use their cellphones to communicate with other co-conspirators and others involved in the criminal [activity] before, during, and after engaging in criminal activity."

2. The motion to quash the warrant and suppress evidence

In April 2023, a few months before the retrial, Fields moved to quash the warrant under which his cell phone records were obtained and suppress that evidence. Fields argued that the warrant was overbroad and lacked particularity under the Fourth Amendment and ECPA because even though the police "were investigating criminal activity that took place on a single day—September 2, 2021," the warrant sought records from a six-week period. Fields also argued that the constitutional good-faith doctrine does not apply to warrants that violate ECPA.

The prosecution opposed, arguing that the warrant complied with the Fourth Amendment and ECPA because it was "not overbroad," was "sufficiently particularized," and "did not exceed the scope of probable cause." (Some capitalization and boldface omitted.) The prosecution claimed the warrant covered a time period "within a reasonable amount of time before and after the burglar[ies]," especially since Fields "was found in possession of the Cadillac two weeks after" the crimes and there was "an implied ability to fence goods" given their high value. Thus, "evidence of association, ownership, and theft planning all required a time frame [going] beyond the date of the crime[s] charged."

10

In reply, Fields admitted it was "reasonable" to seek data "to determine if [his] phone was near the crime scenes," but "[t]o widen [the search] to a month before [was] all too exploratory in nature and convert[ed] the warrant into a general warrant based on suspicion and not probable cause." He also questioned the prosecution's conspiracy-related justification, noting that the contents of communications were not sought and there was "no attempt to articulate the probable cause as to specific conspirators" and thus limit the search to communications with particular phone numbers.

At the hearing on the motion to suppress, the trial court asked the parties to focus on the warrant's "six-week scope" as "the central issue." Fields argued that seeking all of his calls and movements for six weeks was "too broad," given the crimes "occurred on one day." The prosecutor responded that the four-week period before the crimes was justified because the crimes suggested "planning" and "casing," and the two-week period afterward was justified because it was likely the stolen goods would be fenced. The prosecutor also argued that the larger period was relevant to show the cell phone's normal pattern of use and whether its use during the day in question was outside that pattern. The court denied the motion, stating it took Fields's "privacy rights seriously" but believed the warrant had "a reasonable scope . . . under the circumstances of the investigation."

B.    *Analysis*

1.    General legal standards

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.) To determine whether a warrant is

11

valid, "courts examine three factors:  probable cause, particularity[,] and overbreadth." (*People v. Meza* (2023) 90 Cal.App.5th 520, 535 (*Meza*).)

A defendant may move to suppress evidence on the basis that the warrant lacked probable cause or otherwise violated "federal or state constitutional standards." (§ 1538.5, subd. (1)(B)(iii) & (v).)  Fields claims the warrant at issue both lacked probable cause and was constitutionally overbroad.  The relevant question in determining " 'whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 659.)  Although " '[t]he test for probable cause is not reducible to "precise definition or quantification[,]" ' . . . it is ' "less than a preponderance of the evidence or even a prima facie case." ' " (*Ibid.*)  In turn, a warrant is overbroad if it is not " 'limited by the probable cause on which the warrant is based.' " (*Meza, supra*, 90 Cal.App.5th at p. 535.)

" 'In reviewing the trial court's suppression ruling, we defer to its factual findings if supported by substantial evidence.  We independently assess the legal question of whether the challenged search or seizure satisfies the Fourth Amendment.' " (*Meza, supra*, 90 Cal.App.5th at p. 536, quoting *People v. Brown* (2015) 61 Cal.4th 968, 975.)  We review the magistrate's probable-cause determination with deference, disturbing it " 'only if the affidavit fails as a matter of law to set forth sufficient competent evidence' supporting the finding of probable cause." (*People v. Westerfield, supra*, 6 Cal.5th at p. 659.)

2.     Probable cause supported the warrant.

Fields claims that even though Sergeant Servat's "affidavit set forth significant evidence that crimes occurred," it did not establish "a fair

12

probability that evidence would be found" in "cell phone records for a number associated with [him]." We are not persuaded.

Probable cause is assessed under "the totality of the circumstances described in the affidavit." (*People v. Farley* (2009) 46 Cal.4th 1053, 1098.) It "does not require conclusive evidence that a search will uncover relevant evidence." (*Meza*, *supra*, 90 Cal.App.5th at p. 536.) In determining whether a fair probability exists that a search will uncover evidence of a crime, "a magistrate may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the type of offense." (*Ibid.*)

Noting that the affidavit at issue contained no physical descriptions of the suspects at either Costco or the R.s' home, Fields argues that his ownership of the Cadillac was an insufficient basis to infer he was one of the suspects at Costco. He also argues that since a different car was seen at the R.s' home, there was even less basis for linking him to the Paris Street burglary. Finally, he claims that there was insufficient information about his prior arrests to determine whether they supported the conclusion that he was involved in the crimes at issue.

We are unpersuaded by these arguments. Contrary to Fields's position, there was a substantial probability that Fields was one of the suspects at Costco based on the suspects' presence in a vehicle registered to him. Fields states that he "is not aware of any presumption that the driver of a vehicle is the registered owner," but it did not matter whether he was the driver in particular. Given Fields's possession of the Cadillac two weeks later when he was detained in Oakley and his criminal history, including an open case for burglary, it was reasonable to infer he was probably present when his car was in the Costco parking lot. It was also reasonable to infer that the Cadillac's occupants vandalized and burglarized the R.s' SUV, even though

13

those acts were not captured on camera, because there was no indication anyone else approached the SUV during the relevant timeframe. And even if Fields had not been present at Costco, there was no indication the Cadillac was used without his permission. Thus, at minimum there was reason to believe he was somehow involved in burglarizing the R.s' vehicle.

In turn, the Cadillac's involvement in the vehicular burglary was sufficient to link Fields to the burglary of the R.s' home. We agree with the Attorney General that it was reasonable to infer that "the suspects of the car burglary were the same as those of the home robbery and burglary because of the proximity in time and method of entry into the home." The suspects at Costco apparently targeted the R.s' vehicle, stole their garage door opener, and used it to open their garage less than half an hour later. Fields, who did not file a reply brief, does not respond to this argument. Although he is correct that a car other than the Cadillac transported the suspects to Paris Street, the Cadillac's clear involvement in the theft of the garage door opener used to effectuate the crimes at the victims' home established a sufficient link between him and those crimes.

We also note that although Fields argues broadly there was not probable cause to search his cell phone records, he does not contest that if there was probable cause to believe he was involved in the crimes, there was probable cause to believe evidence would be found on his cell phone. "[C]ell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." (*Carpenter v. United States* (2018) 585 U.S. 296, 315.) Since there was probable cause to link Fields to the crimes at issue and he admittedly had a cell phone, it was sufficiently probable that a search of that phone's records would uncover relevant evidence.

14

3.     Fields's overbreadth argument fails.

Having concluded that probable cause supported the warrant, we may more quickly dispose with Fields's overbreadth argument.  As he did below, Fields on appeal effectively admits that the warrant was not overbroad to the extent it sought cell phone records from September 2, 2021, the day of the crimes.  Nonetheless, he apparently assumes that if the six-week period was overbroad at all, *all* the cell phone records obtained under the warrant should have been suppressed.

In fact, "[e]ven when a warrant is overbroad in part, evidence will not be suppressed if it was seized pursuant to a portion of the warrant which was not." (*People v. Holmsen* (1985) 173 Cal.App.3d 1045, 1048, italics omitted; see *People v. Camarella* (1991) 54 Cal.3d 592, 607, fn. 7.)  And if evidence was seized under a "provision of the warrant [that] *was* overbroad," there is no resulting error unless that evidence was introduced at trial. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1043–1044, italics added; *People v. Ulloa* (2002) 101 Cal.App.4th 1000, 1005–1006.)

The vast majority of the cell phone data discussed at trial was from September 2, the day Fields concedes was within an appropriate temporal scope.  The only other dates whose data played a role in the prosecution's case were September 7, one of the other days the Cadillac crossed the Bay Bridge, and September 14, the day Fields was detained in Oakley.  Fields does not argue that the warrant was overbroad in including these dates, meaning he fails to show that the data from them should have been suppressed. (*People v. Carpenter*, *supra*, 21 Cal.4th at pp. 1043–1044.)  In any event, we conclude that these dates were appropriately included in the warrant's scope, as they were during a period of less than two weeks between

15

the crimes and Fields's detention.  Thus, no error appears in the denial of the motion to suppress as to the cell phone records from September 2, 7, and 14.

Finally, although we recognize that technically all the cell phone records from the six-week period were introduced into evidence, the expert did not analyze or discuss any of the data other than that from the three days we have identified, plus the inconclusive data from August 31.  Therefore, even if the warrant was overbroad in including any other days, the error was harmless beyond a reasonable doubt.  (*In re Frank* (1985) 38 Cal.3d 711, 730–731; *People v. Tewksbury* (1976) 15 Cal.3d 953, 972; see *Chapman v. California* (1967) 386 U.S. 18, 24.)

## III.
### DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.


WE CONCUR:



_____

Banke, J.




_____

Hill, J.*




*Judge of the Superior Court of the County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Fields*  A168364


17